2016 IL App (1st) 123092

FIRST DIVISION
MARCH 31, 2016

No. 1-12-3092

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No.  00 CR 7694 |
| | ) | |
| LAWRENCE WIDEMAN, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Justices Connors and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant-appellant Lawrence Wideman appeals the circuit court's denial of his motion seeking leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)).   For the following reasons, we conclude that the defendant did not establish his right to obtain leave to file the successive postconviction petition, and thus we affirm the judgment of the circuit court of Cook County.

¶ 2                              BACKGROUND

¶ 3    In a 2004 jury trial, the defendant was convicted of first degree murder and armed robbery in connection with the death of 51-year-old Howard Thomas on August 6, 1999. Thomas died of blunt trauma injuries after being beaten by group of teenaged individuals that allegedly included the defendant, Frad Muhammad, Gregory Reed, and Marvin Treadwell.

¶ 4    The defendant was arrested in connection with Thomas' death on February 19, 2000.  The following day, he signed a statement in which he described his participation in the attack on Thomas.

¶ 5     Prior to trial, the defendant filed a motion to quash arrest.   At the December 2001 hearing on that motion, Chicago police officer Sergeant Charles E. Williams testified that witnesses to the crime provided information leading to the arrest of Muhammad and Reed, both of whom told police that a person known as "Red" participated in the crime.  Reed identified the defendant's residence as where "Red" lived, and Reed and Muhammad subsequently identified a photograph of the defendant.  The trial court denied the motion to quash the defendant's arrest.

¶ 6     Separately, the defendant filed a motion to suppress his statement as involuntary.  In that motion, he asserted that the police interrogated him over the course of 35 hours despite his repeated requests to speak with an attorney, and that he was subject to physical and mental coercion before he signed the statement.  After a hearing on the motion to suppress, which included testimony from the assistant State's Attorney who had interviewed the defendant and prepared the statement that he eventually signed, the trial court denied the motion to suppress on February 25, 2004.

¶ 7     The defendant's jury trial on the charges of first degree murder and armed robbery commenced on October 19, 2004.

¶ 8     A number of witnesses testified at the defendant's trial, although only one of those witnesses (whose affidavit forms the basis for this appeal) specifically identified the defendant as one of Thomas' assailants.

¶ 9     The trial witnesses included Derek Barnes and his brother Ronald, both of whom lived in the same building at the time of the attack.  Derek testified that shortly after midnight on August 6, 1999, he saw a group of "about four" teenagers walk past his residence.  Derek did not recognize any of the individuals.  Shortly thereafter Derek was talking to his brother when he heard "the noise of a person cracking some type of instrument on something" and "a guy

hollering." Derek recalled that approximately five houses down the block he saw the group of teenagers and heard someone saying something to the effect of "Stop. Don't kill me." Derek testified he saw "one or two" of the teenagers "swinging, like they were hitting something on the ground." Derek recalled "one person swinging and two people kicking" but could not say whether all of the members of the group were involved in the attack.

¶ 10    Ronald Barnes also testified that he was with Derek when he saw a man being beaten by a group approximately 50 yards away. Ronald "heard cracking of a bone" and heard the victim ask his attackers not to kill him. Ronald could not recall exactly how many people were in the group but estimated it was "[m]ore than two, three." Ronald recalled that certain members of the group were kicking and that one person swung an object toward the victim. Ronald could not identify any of the attackers.

¶ 11    The State next called Jori Garth, who testified that in August 1999 she was 14 years old and lived at 7324 S. Calumet with her mother. At the time Garth had a boyfriend, Anton Williams, who was 16 years old.

¶ 12    Garth testified that she and Williams were talking on the porch at her mother's house on the night of the attack, when a group of five or six individuals approached her house. She recognized certain of the individuals. However, Garth did not testify that she recognized the defendant as a member of the group.

¶ 13    Garth stated that Reed walked up to the porch and spoke with her and Williams for a time, while the others in the group stayed in front of the house talking among themselves. At one point, someone in the group said "There goes that mother *** right there" and the members of the group "ran off." Garth then saw three members of the group fighting with a man about two houses south of her residence. She saw "two people that were physically engaged with him,

as far as kicking and hitting him" and saw another individual, Muhammad, swing a baseball bat at the man. She testified that the man was "thrown into [a] car," after which members of the group continued to kick and "stomp" on the victim as he lay on the ground, and another person "continued to beat him with the bat." Eventually the group walked away from the scene.

¶ 14    Garth testified that she spoke to detectives later that evening, but did not tell them what she had seen because she was "scared" and "didn't want to get involved." She also did not tell police that Williams had been with her at the time of the incident. It was not until February 2000, after her father brought her and Williams to the police station, that she told the police what she knew about the incident.

¶ 15    Following Garth, Williams also testified that he had been with Garth on the porch of her residence when "four or five" guys walked up. Among those individuals, Williams testified that he recognized the defendant, whom he knew as "Red," as well as Muhammad, Treadwell, and Reed. Williams testified that Reed spoke with him and Garth on the porch, while the other individuals remained in the front yard talking amongst themselves.

¶ 16    Williams saw a man walking down the street carrying a bag. The group attacked the man.   Williams testified that the defendant and Muhammad "rushed" the man and "start[ed] beating on him," after which other members of the group joined in the attack. Williams recalled that Muhammad used a baseball bat to hit the victim, while other members of the group continued to punch and kick him. The victim was thrown into the side of a car, and one of the attackers "stomp[ed]" him while others continued to punch and kick him. Williams estimated that the attack lasted five or six minutes, after which the group walked away.

¶ 17    Williams did not speak to the police on the night of the beating, testifying that he had been afraid for his and Garth's safety. He first told police about the incident at the police station

on February 16, 2000. Williams acknowledged that he subsequently viewed a lineup in which he identified the defendant as a participant in the attack.

¶ 18    Sergeant Charles Williams also testified that Garth's father brought Garth and Williams to the police station on February 16, 2000, which led the police to arrest Muhammad, Reed, and Treadwell. Sergeant Williams testified that information from Reed led to the defendant's arrest, and that Anton Williams later identified the defendant in a lineup.

¶ 19    Following Sergeant Williams, Assistant State's Attorney Victoria Ciszek testified that she became involved in the case on February 20, 2000. On that date, the defendant agreed to speak with her about the attack on Thomas after she him informed of his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). Ciszek testified that she informed him of "several different options in which we could document or memorialize his statement" and that he agreed to submit a handwritten statement, whereby Ciszek would "write out what he was telling me what happened."

¶ 20    Later that evening, Ciszek recorded the defendant's statement in the presence of another officer, Detective Howard. After ascertaining his understanding of his *Miranda* rights, Ciszek proceeded to write down the defendant's responses to her questions about the attack on Thomas. Ciszek testified that she reviewed the entire statement with the defendant, who had an opportunity to make changes to the statement. The defendant, Ciszek, and Detective Howard signed at the bottom of each page of the statement after the defendant reviewed it.

¶ 21    The defendant's signed statement was published to the jury. In the statement, the defendant recalled that on the night of the attack he was with Muhammad, Reed, Treadwell and another individual. According to the statement, the group went to a liquor store on 75th Street

and "while they were walking toward the liquor store *** they were talking about robbing someone" "so that they could get money for liquor."

¶ 22    After they purchased liquor, the group "stopped at a house in the 7300 block of Calumet because they saw some girls and guys on a porch." According to his statement, "they were there for a while when [the defendant] saw [Treadwell] fighting with a man," after which the defendant "joined in to get the man off of [Treadwell]." The defendant "grabbed the man from behind and the man wrestled away from him." The defendant then "hit the man with his fist on the man's side" and "swung at the man but connected only once." According to the statement, Muhammad then "came at the man with a baseball bat" and struck him several times. The defendant's statement recounts that he then took the bat from Muhammad and "hit the man a couple of times," causing the man to fall to the ground. The defendant stated that he "knew that he would harm the man by hitting him with a baseball bat."

¶ 23    According to the statement, the defendant then met up with Reed, Muhammad, and Treadwell. The defendant "drank pop that the man had in a bag" and "everyone else drank the pop, as well." The defendant also believed that "someone took money from the man because of what they talked about earlier." The written statement indicates that the defendant gave it voluntarily and that "no threats or promises were made to him to get him to make this statement."

¶ 24    The defendant declined to testify, and did not call any witnesses in his defense. On October 21, 2004, the jury convicted the defendant of first degree murder and armed robbery. On January 13, 2005, the court sentenced the defendant to 43 years in the Illinois Department of Corrections for first degree murder and a concurrent sentence of 10 years for armed robbery.

¶ 25    In a direct appeal, on March 27, 2007, this court affirmed the defendant's conviction and sentence, rejecting his arguments regarding his unsuccessful pretrial motions to quash his arrest

and to suppress his statement. *People v. Wideman*, 372 Ill. App. 3d 1099 (table) (unpublished order under Supreme Court Rule 23).

¶ 26    On June 12, 2008, the defendant filed his first petition for postconviction relief pursuant to the Act. In that petition he asserted, among several other arguments, a claim of "actual innocence" based on the lack of a "specific determination as to who delivered the fatal blow upon the victim," and additionally argued that his mere presence at the scene was insufficient to support a conviction. The trial court summarily dismissed the petition on September 5, 2008, and denied the defendant's motion to reconsider. The defendant attempted to appeal those rulings but he was denied leave to file late notices of appeal. See *People v. Wideman*, 2013 IL App (1st) 102273, ¶ 7, n.1.

¶ 27    On January 27, 2010, the trial court granted the defendant leave to file a successive petition. On May 7, 2010, the defendant filed that petition, "claiming actual innocence on the basis that codefendants Muhammad and Treadwell would testify that [the defendant] was merely present at the scene of the instant offenses and did not participate." *Id.* ¶ 9. The petition attached purported affidavits from Muhammad and Treadwell indicating that the defendant was "merely present" in the vicinity of the crime. However, as the affidavits were not dated or notarized, the trial court held that they had "no legal effect" and dismissed the petition on June 21, 2010. Our court affirmed that dismissal. See *id.* ¶ 18 (explaining that the defendant "fail[ed] to give *any* explanation as to why Muhammad and Treadwell could not obtain notarization to verify their own signed affidavits" (emphasis in original)).

¶ 28    On September 23, 2011, the defendant moved for leave to file another successive post-conviction petition. In that motion, the defendant alleged that "he ha[d] obtained affidavits, signed and sworn statements, as well as other documentary evidence" to support a "freestanding

claim of 'Actual Innocence.' "  In particular, the defendant contended that an affidavit by Williams would support his "claim of 'Actual Innocence,' police coercion, and reasoning for not having provided an honest account of the events surrounding the crime."

¶ 29    The defendant claimed that such affidavits were "not previously available to him" and constituted new evidence with a "great probability to change the outcome at trial."  The defendant averred that because he is "indigent, incarcerated, and *pro se*, [he] had absolutely no way of acquiring an affidavit from the primary affiant *** or even contacting said affiant, in order to submit said affidavit in any prior pleading."  He thus asserted that the affidavits supporting his claim had not been available "despite the exercise of due diligence" and were not known to him "until after his filing prior pleadings."

¶ 30    In addition to his claim of "actual innocence," the defendant's motion for leave to file his second successive postconviction petition argued that he met the independent "cause and prejudice" basis to permit leave pursuant to the Act.  However, no affidavits or other documentary evidence were attached to the September 2011 motion for leave to file the successive petition.  On November 21, 2011, the trial court (which was not the same judge who presided over the trial or the defendant's prior postconviction proceedings) denied leave to file the successive petition, noting that the defendant "attached no supporting documentation concerning the affidavit allegedly obtained."

¶ 31    On December 20, 2011, the defendant submitted a motion for reconsideration of the denial of his motion for leave to file a successive postconviction petition.  Attached to the motion for reconsideration were several documents, including a signed and notarized affidavit by Williams, dated May 17, 2010.  In that affidavit, Williams states that he was present during the attack and that he saw Treadwell and Muhammad attack Thomas.  Williams' affidavit states that

the defendant was present, but that the defendant was "only standing there" and "didn't do anything at all" to Thomas.

¶ 32    Williams' affidavit claims that he gave this information to the police, but "[d]espite what I told them about [the defendant], they still subpoenaed me to court." Williams states that he "did not want to testify but the police told me if I did not testify, I would get into trouble." Thus, he "testified in order to stay out of trouble [and] get the police off my back." Also attached to the motion to reconsider is a letter dated May 19, 2010 from a private investigator addressed to the defendant. That letter indicates that, at the defendant's request, the private investigator contacted Williams and obtained Williams' affidavit.

¶ 33    The motion to reconsider attached several other documents, including: (1) an affidavit from the defendant claiming that he signed the statement only after being assaulted by a detective; (2) a notarized affidavit from the defendant's grandmother, stating that police denied her requests to speak with the defendant after he was taken into custody; and (3) nonnotarized affidavits from Treadwell and Muhammad in which they denied that the defendant participated in the attack.

¶ 34    On September 14, 2012, the trial court denied the motion in an oral ruling. Notably, at that time, the trial court did not describe the motion as one to *reconsider* its November 2011 ruling, and made no mention of that prior ruling. Instead, the trial court stated it was ruling on the defendant's "motion for leave to file successive PC [postconviction] petition." Moreover, the trial court did not reference any of the documents attached to the motion for reconsideration, including the Williams affidavit. Rather, the trial court (as it had in its November 2011 ruling) stated that it was denying the motion due to a lack of supporting documentation:

"Here the petition attests that newly discovered evidence proves he

is actually innocent; however, the petition attaches no supporting

documentation regarding the evidence allegedly obtained \*\*\*.

Since he did not attach any affidavits or set forth any basis for the

granting of relief, the court is going to deny his motion for leave to

file a successive PC petition \*\*\*."

¶ 35    On September 19, 2012, the defendant filed a notice of appeal.

¶ 36                                    ANALYSIS

¶ 37    We note that we have jurisdiction, as the defendant perfected a timely notice of appeal

from a final judgment in a postconviction proceeding.  See Ill. S. Ct. R. 651 (eff. Feb. 6, 2013).

¶ 38    The Act "provides a statutory remedy to criminal defendants who claim that substantial

violations of their constitutional rights occurred at trial" which "is not a substitute for an appeal,

but rather, is a collateral attack on a final judgment." *People v. Edwards*, 2012 IL 111711, ¶ 21.

Under the Act, "[o]nly one petition may be filed by a petitioner \*\*\* without leave of the court."

725 ILCS 5/122-1(f) (West 2012).   "[B]oth the language of the Act and our own case law make

clear that only one postconviction proceeding is contemplated under the Act.  Nevertheless, [our

supreme] court has, in its case law, provided two bases upon which the bar against successive

proceedings will be relaxed." *Edwards*, 2012 IL 111711, ¶ 22.

¶ 39    "The first basis for relaxing the bar is when a petitioner can establish 'cause and

prejudice' for the failure to raise the claim earlier." *Id.* (quoting *People v. Pitsonbarger*, 205 Ill.

2d 444, 459 (2002)).   The General Assembly has since "codified the cause-and-prejudice

exception in section 122-1(f) of the Act." *Id.*  Thus, section 122-1(f) of the Act provides that

leave "may be granted only if a petitioner demonstrates cause for his or her failure to bring the

- 10 -

claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2012). The "cause" element is shown "by identifying an objective factor that impeded [the defendant's] ability to raise a specific claim during his or her initial post-conviction proceedings." *Id.* Prejudice is shown by "demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 40     Apart from the "cause and prejudice" basis codified in the Act, our supreme court has also held that a colorable claim of "actual innocence" will permit a successive postconviction petition. Our supreme court has stated: "The second basis by which the bar to successive postconviction proceedings may be relaxed is what is known as the 'fundamental miscarriage of justice' exception. [Citation.]" *Edwards*, 2012 IL 111711, ¶ 23. "In order to demonstrate a miscarriage of justice to excuse the application of the procedural bar, a petition must show actual innocence." *Id.*

¶ 41     *Edwards* defined the requisite showing of actual innocence as follows:

> "With respect to those seeking to relax the bar against successive postconviction petitions on the basis of actual innocence, *** leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence. [Citations.] Stated differently, leave of court should be granted when the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted him

in the light of the new evidence [citation]." (Internal quotation marks omitted.) *Id.* ¶ 24.

*Edwards* elsewhere instructs that "[t]he elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 32.

¶ 42    Notably, our supreme court in *Edwards* explicitly declined to decide the applicable standard of review of a trial court's decision on a motion for leave to file a successive petition:

> "Generally, decisions granting or denying 'leave of court' are reviewed for an abuse of discretion. [Citation.] However, *** a trial court should deny leave only in cases where, as a matter of law, no colorable claim of actual innocence has been asserted. This suggests a *de novo* review. We need not decide this question in this case, however. Petitioner's claim of actual innocence here fails under either standard of review. *** We therefore leave this issue for another day and a more appropriate case." *Id.* ¶ 30.

¶ 43    With this framework in mind, we turn to whether the circuit court erred in denying the defendant leave to file a successive postconviction petition.

¶ 44    In arguing for reversal, the defendant's appellate brief "analyze[s] only the legal effect of the notarized affidavit from the State's key witness, Anton Williams" and does not rely on the other documents submitted with his motion to reconsider. The defendant asserts that the Williams affidavit is sufficient to allow a successive postconviction petition under *either* the "actual innocence" or the "cause and prejudice" bases recognized by our supreme court.

¶ 45    At the outset, we acknowledge that the trial court's September 2012 oral ruling indicates that the trial court did not consider the contents of the Williams affidavit, as the court stated that the defendant "did not attach any affidavits."  Indeed, the transcript suggests that the court did not realize that, in November 2011, it had already denied the motion for leave to file a successive postconviction petition due to a lack of supporting documentation, and that it was being asked to consider the defendant's motion to *reconsider* that ruling and its supporting documents.

¶ 46    Nonetheless—even if we apply a *de novo* review to the contents of the September 2011 motion for leave, the December 2011 motion to reconsider, and the Williams affidavit—we do not find that the defendant satisfied his burden to obtain leave to file this successive post-conviction petition.

¶ 47    Before addressing the particular requirements of the "actual innocence" or "cause and prejudice" bases for leave to file the successive petition, we first address the State's argument that the doctrine of *res judicata* independently bars the defendant from filing a successive postconviction petition.  The State argues that, since the defendant has asserted claims of "actual innocence" in two earlier postconviction petitions, he is precluded from asserting a third claim of actual innocence.

¶ 48    Specifically, the State notes that the defendant's initial postconviction petition claimed (among other arguments) that there was insufficient proof of "who delivered the fatal blow" and that his "mere presence" at the scene did not establish criminal liability.  The State also points out that his first successive postconviction petition claimed actual innocence based on the statements of Muhammad and Treadwell.  The State thus argues that his latest claim of actual innocence is barred by *res judicata*, "to the extent that the issue has been litigated and decided ***; and to the extent that it has not been raised, it is waived."

¶ 49    Our supreme court discussed the application of *res judicata* and other preclusion doctrines in the context of postconviction litigation in *People v. Ortiz*, 235 Ill. 2d 319 (2009). Our supreme court recognized:  "The preclusion doctrines of *res judicata*, collateral estoppel, and law of the case prevent a defendant from taking two bites out of the same appellate apple and avoid piecemeal post-conviction litigation. [Citation.]"  (Internal quotation marks omitted.)  *Id.* at 332.   However, "[w]here a defendant presents newly discovered, additional evidence in support of a claim, collateral estoppel is not applicable because it is not the same 'claim.' "  *Id.* Thus, *Ortiz* held that preclusion doctrines did not apply to bar "multiple claims of actual innocence where each claim is supported by newly discovered evidence."  *Id.* at 333.   Thus, our supreme court found that the successive petition at issue in that case was not precluded where, "although defendant's first two petitions also alleged actual innocence, defendant's third petition presented a new 'claim' of actual innocence because it offered two additional eyewitnesses who were previously unknown to defendant."  *Id.*

¶ 50    In this case, the defendant asserts that the *Ortiz* holding is dispositive of the State's *res judicata* argument.  That is, although the defendant previously asserted postconviction claims of actual innocence premised on *other* evidence, the defendant asserts that Williams' affidavit is "newly discovered evidence of [the defendant's] actual innocence and therefore the new claim is not procedurally barred."

¶ 51    The applicability of *res judicata* thus turns on whether the Williams affidavit was, in fact, "newly discovered evidence."  In other words, if the Williams affidavit is *not* newly discovered evidence—and thus could have been submitted with his prior postconviction claims of "actual innocence"—his reliance on that affidavit in his latest postconviction petition would be barred.

¶ 52    We thus address whether the Williams affidavit was "newly discovered evidence."    In *Ortiz*, our supreme court stated that "newly discovered" evidence is "defined as evidence that has been discovered since the trial and that the defendant could not have discovered sooner through due diligence." *Id.* at 334 (holding that an affidavit from an eyewitness was newly discovered evidence where the witness "did not admit to his having witnessed the incident until more than 10 years after trial" and had "essentially made himself unavailable as a witness when he moved to Wisconsin shortly after the murder").

¶ 53    "Generally, evidence is not 'newly discovered' when it presents facts already known to the defendant at or prior to trial, though the source of those facts may have been unknown, unavailable, or uncooperative." *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007).    In this case, Williams was a witness at trial and thus the defendant would have known immediately whether Williams gave false testimony.  Nevertheless, a recantation of trial testimony may still be considered new evidence:  "Courts have held that defendants will not be precluded from presenting a witness's recantation as newly discovered evidence, though they knew the witness to be perjuring himself or herself.  [Citation.]  But, this exception will not apply if the defendant had evidence available at the time of trial to demonstrate that the witness was lying." *Id.* at 524; see also *People v. Morgan*, 212 Ill. 2d 148, 154-55 (2004) (recantation of eyewitness's trial testimony 17 years after defendant's conviction was "newly discovered" where it "was not available at defendant's original trial and \*\*\* the defendant could not have discovered it sooner through diligence").

¶ 54    It appears that, at least at the time of trial, the defendant did not have evidence available to demonstrate that Williams was lying when he testified that the defendant took part in the attack on Thomas.  In particular, the other codefendants allegedly involved in the attack, such as

Muhammad and Treadwell, could not have been compelled to testify to contradict Williams' trial testimony. See *People v. Molstad*, 101 Ill. 2d 128, 135 (1984) (holding that affidavits of codefendants were newly discovered evidence, as "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination [citation] if the codefendants did not choose to do so").

¶ 55    Significantly, however, this is the defendant's *third* postconviction petition. Case law is not entirely clear as to whether – in cases of *successive* postconviction petitions – it is sufficient for the defendant to demonstrate that the "new" evidence relied upon could not be discovered by the time of trial, or if he must also show that it could not be discovered with reasonable diligence before his earlier postconviction filings. That is, although the supreme court has defined "newly discovered evidence" as "evidence that has been discovered since the trial *and that the defendant could not have discovered sooner through due diligence*," that statement does not specify whether, to support a successive postconviction petition, the defendant must show that the evidence was not available at any time "sooner" than his most recent postconviction pleading. (Emphasis added.) *Ortiz*, 235 Ill. 2d at 334.

¶ 56    We recognize that our recent decision in *People v. Smith*, 2015 IL App (1st) 140494, suggests that the focus should be limited to whether the evidence was available at the time of trial. In *Smith*, an eyewitness (Evans) testified that the defendant was the shooter at a 2003 murder trial. *Id.* ¶ 4. In March 2010, the defendant filed a postconviction petition; in October 2012, the defendant "supplemented Smith's postconviction petition" and attached an affidavit in which Evans stated that he had developed doubts about the accuracy of his trial testimony but did not inform anyone until the summer of 2012. *Id.* ¶ 12. The State argued that Evans' recantation was not newly discovered evidence because the defendant failed "to show that he could not have

learned of Evans' doubts about his identification [testimony] 'prior to the middle of 2012.' " *Id.* ¶ 19. Our court rejected the State's argument and emphasized that the defendant "need only demonstrate that his failure to discover the evidence *prior to trial* was not due to a lack of diligence. [Citations.]" (Emphasis in original.) *Id.* However, we note that *Smith* is procedurally distinguishable in that it did not concern a *successive* postconviction petition, but rather an initial postconviction petition that had been *supplemented* with new evidence.

¶ 57 On the other hand, other cases suggest that "if the evidence was available at a prior posttrial proceeding, the evidence is *** not newly discovered evidence." *People v. Snow*, 2012 IL App (4th) 110415, ¶ 21. For example, we have held that the identification of witness "as a potential alibi witness for the first time in [a defendant's] successive petition" was not "newly discovered evidence" where the "defendant was aware that [the witness] was with him during the time in question and he had this information available to him both at the time of trial *and when he filed his initial postconviction petition.*" (Emphasis added.) *People v. English*, 403 Ill. App. 3d 121, 133 (2010).

¶ 58 Keeping in mind the desire to avoid "piecemeal post-conviction litigation" (internal quotation marks omitted) (*Ortiz*, 235 Ill. 2d at 332), we find it is appropriate, for *res judicata* purposes, to review not only whether the testimony in Williams' affidavit could have been discovered at the time of trial, but whether that evidence was available when the defendant filed his previous postconviction pleadings.

¶ 59 Although the defendant has generally averred that the Williams affidavit was not previously available, we do not find that he has shown that the Williams affidavit is "newly discovered," as he has made no specific showing that he "could not have discovered [it] sooner through due diligence." *Id.* at 334. We recognize that "well-pleaded facts" in a successive

postconviction petition and in the supporting affidavits are to be "take[n] as true." *People v. Pitsonbarger*, 205 Ill. 2d 444, 467 (2002). However, we do not find that the defendant has offered any specific, well-pleaded explanation as to why the Williams affidavit could not have been submitted earlier.

¶ 60    The defendant's September 2011 motion for leave to file his petition claimed that "being indigent, incarcerated and *pro se* [he] had absolutely no way of acquiring an affidavit" from Williams.    Even if we accept the defendant's statements regarding his situation of being indigent, incarcerated and *pro se*, there needs to be more factual support for his claim that this is "newly discovered" evidence which could not have been uncovered by due diligence. For example, a short statement regarding how the evidence came to his attention while he was incarcerated would shed light on an important aspect of his narrative. It would also help to clarify the question of the defendant's diligence in discovering this information at this particular point in time. However, his motion fails to describe in any detail *when* or *how* he learned that Williams was prepared to recant his trial testimony, or to otherwise describe any diligent efforts in attempting to contact Williams and obtain the affidavit. Further, we note that the defendant's status as a *pro se*, incarcerated litigant obviously did not prevent him from filing either his 2008 initial postconviction petition, or the 2010 successive postconviction petition.[1]

¶ 61    The defendant's December 2011 motion to reconsider, which for the first time attached the Williams affidavit, also does not offer any explanation of due diligence in seeking Williams' recantation. The motion to reconsider attaches a letter dated May 19, 2010 indicating that a

---

[1]Notably, the Williams affidavit is dated May 17, 2010, merely 10 days after the filing of the defendant's first successive postconviction petition, which attached the unsworn affidavits of Muhammad and Treadwell. This suggests that the defendant could have supplemented that prior petition with the Williams affidavit.

private investigator obtained the Williams affidavit at the defendant's request. However, that letter (which is unsworn) gives no indication regarding *when* the defendant first sought to contact Williams, nor does it address any prior difficulties in contacting Williams, or any other evidence of due diligence to show why the Williams affidavit could not have been obtained until May 2010, several years after his trial testimony. Further, the statements in Williams' affidavit do not provide any indication as to when he was contacted by the defendant, and does not suggest that Williams was unwilling, or unable, to provide the affidavit at any time between the defendant's October 2004 conviction and May 2010. Further, none of the defendant's submissions explain why the affidavit, which was apparently sent to the defendant in May 2010, was not actually submitted to the court until December 2011 in conjunction with his motion for reconsideration rather than as a supplement to the pending petition.

¶ 62   As the defendant's general averments do not offer a well-pleaded explanation as to why the Williams affidavit could not have been obtained earlier, nor why the defendant did not seek to supplement his pending petition if he received the affidavit while the petition was pending, we find that the defendant has not shown that it was "newly discovered" evidence that could not have been asserted in his prior postconviction petitions. As a result, we agree that this successive petition is precluded by the doctrine of *res judicata*. See *Ortiz*, 235 Ill. 2d at 332-33.

¶ 63   In any event, we need not only rely on *res judicata* in order to determine that the defendant did not meet his burden to show why he should be granted leave to file a successive postconviction petition. That is, even assuming the Williams affidavit qualified as "newly discovered" evidence, we would nevertheless independently conclude that it does *not* satisfy either the "actual innocence" or "cause and prejudice" standards. In particular, given the admission of the defendant's self-incriminating statements at trial, we do not find that the

information contained in the Williams affidavit, upon a retrial, satisfies the requisite probability of a different verdict if Williams' new testimony was presented.

¶ 64    We reiterate that "[t]he elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and *of such conclusive character that it would probably change the result on retrial."* (Emphasis added.) *Edwards*, 2012 IL 111711, ¶ 32.  In other words, to set forth a "colorable claim of actual innocence," the petition "must raise the *probability* that it is *more likely than not* that no reasonable juror would have convicted him in the light of the new evidence."  (Emphases added.) *Id.* ¶ 33.  Further, we note that we must also consider the other evidence presented at trial in deciding whether the "newly discovered" evidence is of such "conclusive" character.  *People v. Coleman*, 2013 IL 113307, ¶ 96 ("[C]onclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result.").

¶ 65    Significantly, in this case, the jury heard the defendant's statement detailing how, on the night of the attack: (1) he and other individuals had discussed their desire "to rob someone so that they could get money for liquor"; (2) that he joined the others in fighting a man and "hit the man with his fists"; (3) that the defendant used the baseball bat to "hit the man a couple of times"; and (4) that "he knew that he would hurt the man by hitting him with a baseball bat."

¶ 66    Nevertheless, the defendant argues that the contents of Williams' affidavit would create a probability of acquittal on retrial.  The defendant's argument emphasizes that Williams was the only trial witness who identified the defendant as one of Thomas' attackers.  Further, he argues that Williams' affidavit "is more than simply a recantation of his identification of [the defendant] as one of the offenders" but is "affirmative evidence that, contrary to [the defendant's] inculpatory statement, he did not attack Howard Thomas."  The defendant thus urges that the

Williams affidavit "raises the probability that it is more likely than not that no reasonable juror would have convicted" the defendant.

¶ 67     We disagree.  The defendant essentially asks us to find that it is more likely than not that the jury would choose to entirely disregard the defendant's detailed confession and acquit the defendant, had the jury heard Williams testify that the defendant was merely "standing there" and "didn't do anything" to Thomas.  The defendant does not explain why the jury would completely disregard his own words detailing his participation in the crime in favor of Williams' testimony to the contrary.  Such a proposition is unreasonable.   Clearly, even if the jury were presented with such conflicting evidence, it could easily conclude that the defendant's detailed, self-incriminating statements were entitled to more weight and (along with the other trial evidence) supported a finding of guilt.  We certainly cannot say that an acquittal on either the murder or armed robbery charge would be "probable" had Williams testified to the statements in his May 2010 affidavit.  Thus, we do not find that the defendant set forth evidence "of such conclusive character that it would probably change the result on retrial" as is required to allow leave to file a successive petition on the basis of actual innocence.  *Edwards*, 2012 IL 111711, ¶ 32.

¶ 68     Furthermore, we do not find that the defendant satisfies the independent "cause and prejudice" test to obtain leave to file a successive postconviction petition under section 122-1(f) of the Act.  First, under the "cause" prong of that test, the defendant must "identify[] an objective factor that impeded his *** ability to raise [this] specific claim during his *** initial post-conviction proceedings."  725 ILCS 5/122-1(f) (West 2012).

¶ 69     We note that, in his appellate brief, the defendant asserts that he meets the "cause" element upon a basis not articulated in his circuit court pleadings.  In particular, he argues that the State violated his due process rights by failing to disclose exculpatory evidence at his trial, as

required pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and related precedent. The defendant argues that the Williams affidavit shows the prosecution failed to disclose the favorable evidence of Williams' statement to police that the defendant was *not* involved in the attack on Thomas. He argues that he meets the "cause" element since, "[b]y failing to disclose that police pressured Williams to falsely identify [the defendant] as one of the offenders, the prosecution impeded [the defendant] from raising the instant *Brady* and perjury claims."

¶ 70    In response, the State contends that the *Brady* violation argued on appeal was not raised in the motion for leave to file a postconviction petition and thus "cannot be argued for the first time on appeal." The State's argument has merit, as our supreme court has emphasized that "our appellate court is not free *** to excuse, in the context of postconviction proceedings, an appellate waiver caused by the failure of a defendant to include issues in his or her postconviction petition." *People v. Jones*, 213 Ill. 2d 498, 508-09 (2004) ("[W]hen appellate counsel discover errors not raised by their clients during *** first-stage postconviction proceedings, the proper course of action for counsel to take is to file a successive petition in which the newly found claim is properly alleged.").

¶ 71    We recognize that the defendant's September 2011 motion for leave to file the successive petition argued that the Williams affidavit demonstrated that the State used "perjurious testimony" which "was directly designed to conceal the petitioner's innocence," and generally asserted that the use of perjury "infected the petitioner's trial and violated the petitioner's due process rights." However, that motion (and the motion to reconsider) did not specify what the

prosecutor did or did not do as required by the prosecution's independent duty to disclose exculpatory evidence pursuant to *Brady*.[2]

¶ 72    In any event, even assuming that he had sufficiently articulated a *Brady*-based argument in the circuit court, the defendant has not identified any specific, objective reason as to why he was unable to include this argument in his prior postconviction petitions.  That is, (as we have discussed in regard to the issue of "newly discovered evidence,") even assuming the truth of the allegations in the motion for leave to file the petition and Williams' affidavit, the defendant has not articulated why the claim could not be discovered earlier with due diligence.  As he has not identified why he was not able to raise this "specific claim during his *** initial post-conviction proceedings" he cannot demonstrate "cause" under the Act.   725 ILCS 5/122-1(f) (West 2012).

¶ 73    Moreover, even assuming that the defendant satisfied the "cause" element, we would find that the defendant had not demonstrated "prejudice" for purposes of section 122-1(f) of the Act. See *id.*  Our court has indicated that, as with claims of "actual innocence," satisfaction of the "prejudice" element of section 122-1(f) requires a showing that the new evidence would probably change the result on retrial.  "To meet the prejudice prong of the cause - and - prejudice test, [the defendant] must show that the absence of the new evidence so infected the trial that the resulting conviction violated due process.  [Citation.]  For new evidence to show prejudice that warrants a new trial, the evidence (1) must be of such conclusive character that it will probably change the

---

[2]In any event, to establish a *Brady* violation, the evidence suppressed must be material. "[F]avorable evidence is material, and constitutional error results from its suppression *** 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' "  *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  As discussed elsewhere in this opinion, in light of the defendant's inculpatory statement admitted at trial, it is highly unlikely that Williams' affidavit would create a reasonable probability that the jury would reach a different verdict.

result on retrial; (2) must be material ***; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier." (Internal quotation marks omitted.) *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 61 (in appeal from summary dismissal of successive postconviction petition, explaining that a defendant "has sufficiently shown prejudice if the record supports his assertion that evidence of [a testifying police officer's] prior perjury probably would change the result on retrial").

¶ 74    In this case, in light of the defendant's confession, we cannot say that it is probable that the result would be different in a new trial, even if the jury heard Williams testify that (1) the defendant was present at the scene of the attack but "didn't do anything" to Thomas, and (2) that the police pressured Williams to testify otherwise. Rather, in its role in deciding the credibility of conflicting evidence, the jury could certainly credit the defendant's explicit, detailed statements describing his participation, notwithstanding contrary testimony from Williams.

¶ 75    As we conclude that the defendant's motion is barred by the doctrine of *res judicata* and fails to satisfy either the "actual innocence" or "cause and prejudice" bases for allowing a successive postconviction petition, we affirm the denial of the defendant's motion for leave to file the instant petition.

¶ 76    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 77    Affirmed.