2025 IL App (1st) 232019-U

No. 1-23-2019

Order filed November 26, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 7694 02 |
| | ) | |
| LAWRENCE WIDEMAN, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's sentence where the circuit court did not fail to consider mitigating evidence.

¶ 2    Defendant Lawrence Wideman appeals from the circuit court's 2023 order resentencing him to concurrent terms of 30 years in prison for first degree murder and 10 years in prison for armed robbery for offenses he committed when he was 17 years old. He was initially sentenced in 2005 following a jury trial. Mr. Wideman argues that the circuit court failed to give adequate

weight to mitigating evidence showing that during his more than 20 years in custody, he has been rehabilitated following a traumatic childhood. For the reasons that follow, we affirm the circuit court.

¶ 3    At trial, the State's evidence showed that, on August 6, 1999, 51-year-old Howard Thomas was robbed and beaten to death. As we have detailed the facts of Mr. Wideman's case in prior dispositions, we include only those relevant to the instant appeal.

¶ 4    Brothers Derek and Ronald Barnes testified that, shortly after midnight on August 6, 1999, they observed a group of people beat a man on the 7300 block of Calumet Avenue, in Chicago.[1] Derek testified the attackers were teenage boys. One boy swung an object at the man and others kicked him while he was on the ground. Derek and Ronald heard the man "hollering" or "screaming" not to kill him.

¶ 5    Jori Garth and her boyfriend, Anton Williams, testified that they were on Ms. Garth's mother's porch on the 7300 block of Calumet just after midnight on August 6, 1999. A group of several people approached the house. Mr. Williams testified the group included Mr. Wideman, Frad Muhammad, Marvin Treadwell, and Gregory Reed. Mr. Reed climbed the stairs to the porch and spoke with Ms. Garth and Mr. Williams, while the others remained at the bottom of the porch talking among themselves.

¶ 6    Mr. Williams testified that, about 15 minutes later, a man walked down the street. Ms. Garth testified that someone said, "There goes that motherf*** right there." Mr. Wideman and Mr. Muhammad "rushed" the man and started punching and kicking him. Mr. Treadwell joined. Mr.

---

[1] Because the witnesses share the same last name, we subsequently refer to them by their first names.

Muhammad hit the man with a wooden baseball bat a few times. The attackers threw him at a vehicle and he fell to the ground. The attackers continued to kick him, and one used the vehicle as leverage to raise himself higher and "stomp[ed]" on the man. Ms. Garth testified that one attacker then continued to hit the man with the bat. The attackers then walked away.

¶ 7    An assistant state's attorney testified that she interviewed Mr. Wideman in custody on February 20, 2000. He gave a handwritten statement, which the State published at trial and was entered into evidence.

¶ 8    According to the statement, Mr. Wideman was 17 years old on the day of the offense. He, Mr. Muhammad, Mr. Reed, Mr. Treadwell, and another individual purchased liquor at a liquor store. On the way to the store, they discussed "want[ing] to rob someone" for more money to buy liquor. After leaving the store, they stopped and spoke with people on a porch. They had been there for a while when Mr. Wideman saw Mr. Treadwell fighting a man. Mr. Wideman "joined in to get the man off" Mr. Treadwell. He grabbed the man from behind but the man "wrestled away." Mr. Wideman punched the man in the side, and "swung" at him "but connected only once."

¶ 9    Mr. Muhammad then struck the man with a baseball bat several times. While Mr. Muhammad struck him, the man stumbled and leaned onto a vehicle. Mr. Wideman took the bat from Mr. Muhammad and hit the man several times, which he knew would hurt the man. The man fell to the ground. The group then walked away and "drank pop that the man had in a bag." Mr. Wideman believed that someone took money from the man because of what they had talked about earlier.

¶ 10    An assistant medical examiner testified that Mr. Thomas suffered fractures to his skull, the orbits of both eyes, nasal bone, jaw, Adam's apple, elbow, and three ribs; lacerations on his face,

inside his lips, and chin; bruising under his scalp; lacerations and contusions inside his brain; bleeding in the muscles surrounding his ribs; lacerations to his kidney and stomach; and abrasions on his elbow, hands, forehead, cheek, and knee. He died of homicide from blunt trauma injuries.

¶ 11     The jury found Mr. Wideman guilty of first degree murder and armed robbery. The trial court sentenced him to 43 years in prison for murder and a concurrent term of 10 years in prison for armed robbery. Mr. Wideman appealed, and we affirmed. See *People v. Wideman*, 2013 IL App (1st) 102273, ¶ 5 (citing *People v. Wideman*, No. 1-05-1137 (2007) (unpublished order under Illinois Supreme Court Rule 23)).

¶ 12     Mr. Wideman subsequently filed several unsuccessful collateral attacks on his convictions. See *id.* ¶¶ 7 n.1, 8-10, 19 (noting denial of leave to file late notices of appeal from dismissal of petition for relief under the Post-Conviction Hearing Act and affirming denial of leave to file a successive postconviction petition); *People v. Wideman*, 2016 IL App (1st) 123092 (affirming denial of leave to file a successive postconviction petition); *People v. Wideman*, No. 1-14-2183 (2017) (unpublished summary order under Illinois Supreme Court Rule 23(c)) (affirming dismissal of petition for relief from judgment).

¶ 13     On October 28, 2019, Mr. Wideman filed a motion for leave to file a successive postconviction petition, along with the petition. Relevant here, he claimed that his 43-year sentence was an unconstitutional *de facto* life sentence under *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Buffer*, 2019 IL 122327, as he was only 17 years old at the time of his offense and the court did not consider his youthful characteristics when imposing his sentence. The State conceded that defendant should be resentenced.

¶ 14    On June 20, 2023, in preparation for resentencing, Mr. Wideman submitted a 25-page "Mitigation Report" authored by Helen Kim Skinner, a "mitigation specialist," licensed clinical social worker, and adjunct professor at Loyola School of Law. Ms. Skinner wrote that, to prepare the report, she reviewed records, interviewed Mr. Wideman three times, and interviewed or supervised interviews of two of his sisters, a cousin, a childhood friend, and other individuals who knew Mr. Wideman and his family when he was a child.

¶ 15    According to Ms. Skinner's report, Mr. Wideman was born on May 14, 1982, making him 17 years old at the time of the offense. He had been the only juvenile among his co-offenders. As a child, his family moved frequently, preventing him from developing strong friendships. His parents divorced when he was eight years old, after which he saw his father only periodically. His mother remarried quickly but divorced again after five or six years, when Mr. Wideman was in seventh grade. Mr. Wideman's family then suffered "extreme poverty."

¶ 16    Mr. Wideman's mother was diagnosed with schizophrenia and had "wildly unpredictable" and "volatile" mood swings. Individuals Ms. Skinner interviewed described Mr. Wideman's mother as "neglectful and abusive," "selfish and manipulative," and "evil." She beat her children with her hands, extension cords, sticks, brooms, mops, belts, stitching chords, or "anything she could get her hands on," inflicting permanent physical and emotional scars on Mr. Wideman. She "never expressed any compassion, love or remorse."

¶ 17    When Mr. Wideman was eight years old, he saw a gang member "brutally" beaten by other members of the gang. A year later, he was with his 13-year-old cousin when multiple men beat his cousin, including using a baseball bat, and stomped on him while he was "lying in a fetal position, 'a bloody mess.' " Mr. Wideman "became too afraid to go anywhere for months." When Mr.

Wideman was 14 years old, he was attacked by a gang member. The following year, gang members "jumped" him, and one struck him in the mouth with a lock, crushing and pushing back two of his front teeth.

¶ 18    As a teenager, Mr. Wideman lived with his grandmother, who became his guardian, and then moved in with his father, which was "more like two adults or roommates" than a parent-child relationship. Mr. Wideman admitted "he was on a path that was not good." He regularly drank alcohol. In 1999, he was arrested four times, and convicted of possessing a stolen vehicle, for which he received juvenile probation.

¶ 19    After his arrest in February 2000 for the instant offenses, he was incarcerated at the Cook County Jail until he was sentenced in January 2005. In jail, he was employed distributing food trays and doing janitorial work. He earned a High School Equivalency Degree and Bible studies certificates. Mr. Wideman described the jail as "wild" and violent, but he stayed grounded through Bible study. Ms. Skinner attached an addendum indicating that Mr. Wideman had disciplinary issues during his time in jail, which Mr. Wideman had admitted, without specifying the nature of the issues.

¶ 20    After sentencing, Mr. Wideman was imprisoned at Menard Correctional Center, and later transferred to Pinckneyville Correctional Center. He had committed 10 infractions over the course of 18 years, and, beginning in 2017, all his infractions were classified as minor. None of the infractions involved violence. Mr. Wideman continued to attend religious services and earned certificates in online ministry courses. He was consistently employed in various positions throughout his imprisonment.

¶ 21    Ms. Skinner opined that Mr. Wideman's misconduct history was "remarkable" given his long sentence, and he demonstrated his ability to abide by structure and rules, avoid conflict, resist peer pressure, and succeed upon release. He committed the instant offense before his brain fully developed, and he had bettered himself in prison. Ms. Skinner concluded that Mr. Wideman had the inner tools and family support to allow him to reenter society successfully, would not reoffend, and had already rehabilitated himself from the person he was before his imprisonment.

¶ 22    Also included in the mitigation report were letters from Mr. Wideman's sisters and a family friend, and an affidavit from another inmate, in support of Mr. Wideman's character.

¶ 23    On July 20, 2023, the court held a resentencing hearing. The court stated it had reviewed the mitigation report. Mr. Thomas's daughter gave a victim impact statement that she had lost her father through a "hideous and violent crime," which was a "devastating blow" that "haunt[ed]" her every day, and the pain of his loss "permeate[d] every aspect of [her] existence." She requested that Mr. Wideman serve his full sentence, remarking that Mr. Wideman and his friends "broke so many" of her father's bones and had no remorse for him.

¶ 24    Mr. Thomas's granddaughter gave a victim impact statement remarking that, by committing murder, Mr. Wideman had chosen to prioritize himself "over the well-being and lives of others." Mr. Wideman was not a child and had been capable of recognizing the wrongness of his actions. She also read a victim impact statement written by her sister, who wrote that Mr. Thomas's loss "left an indescribable void *** causing immense pain and grief," and that releasing Mr. Wideman could cause the family distress and anxiety.

¶ 25    Mr. Wideman's counsel offered the mitigation report into evidence. The court stated that it had thoroughly read the report. Counsel also offered into evidence several more certificates and

letters that had been compiled after the mitigation report was completed, which are not included in the record on appeal.

¶ 26    Mr. Wideman gave a statement in allocution that he had been young and easily influenced on the day of the offense. He regretted his "terrible and foolish decisions" and not preventing Mr. Thomas's death. Mr. Wideman had "refused to assimilate to prison culture" and spent most of his time working, studying, and maintaining his mental health and relationships with his loved ones. With "genuine sorrow," he accepted responsibility for his actions toward Mr. Thomas's family. He "sincerely apologize[d]" and wished he could change what he had done. Mr. Wideman had "put so much will" into transforming himself into a person capable of being a "righteous citizen" and gaining employment to provide for himself and his family.

¶ 27    The court stated it had "carefully reviewed" the record, repeated that it had read the mitigation report, and received the presentations in aggravation and mitigation. It was "moved" by the victim impact statements. It believed Mr. Wideman had committed a "horrible act" in killing "a loving father," which it was considering in fashioning Mr. Wideman's sentence. The court continued that it also had to consider "defendant's youthfulness at the time, his potential for rehabilitation, his lack of judgment at the time, and his progress since this incident."

¶ 28    The court further stated that it would balance the "awful crime" against the facts that Mr. Wideman had received "less than one ticket per year" while in prison, attended classes, worked, and "basically stayed out of trouble." The court reduced Mr. Wideman's sentence for murder from 43 to 35 years in prison, which it thought properly balanced the harm to Mr. Thomas's family while acknowledging Mr. Wideman's "very, very, very troubled childhood," and, more

importantly, that he had taken responsibility for his actions and "made strides" in turning his life around.

¶ 29    On August 18, 2023, Mr. Wideman filed a motion to reconsider, arguing his sentence was excessive based on his background, participation in the offense, youth, and rehabilitation. He cited the additional mitigation factors applicable to offenders under 18 years old provided in section 5-4.5-105(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105(a) (West Supp. 2023)). Mr. Wideman requested a sentence of 23 years in prison.

¶ 30    On October 19, 2023, following argument, the court reduced Mr. Wideman's sentence for murder to 30 years in prison. The court noted that, when imposing the 35-year sentence, it had considered that Mr. Wideman was 17 years old at the time of the offense. It had been aware that he acted impetuously with a group of friends who wanted money for alcohol and no evidence indicated they had planned the offense. The court had also considered that Mr. Wideman came from an environment of physical abuse and emotional neglect, "carefully considered" the mitigation report, and noted that Mr. Wideman had the potential for rehabilitation. Mr. Wideman had received several certificates for completing classes and his behavior in prison had not been perfect but had been "very good." Mr. Wideman had not been "the main actor" in Mr. Thomas's beating but was a "willing participant." The court acknowledged it had to impose a sentence with the goal of restoring Mr. Wideman to useful citizenship "where appropriate."

¶ 31    On appeal, Mr. Wideman argues that, in imposing his sentence, the court failed to give adequate weight to the extensive evidence in mitigation showing his rehabilitation following his traumatic childhood. He requests we reduce his sentence to 23 years in prison, which he has already

served, so he may be released. See Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967) (reviewing court may reduce punishment imposed by the trial court).

¶ 32    The Illinois Constitution requires that sentences "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. When a defendant argues his sentence is excessive, our review is for an abuse of discretion, which occurs where the court's decision is arbitrary, fanciful, or so unreasonable that no reasonable person would agree with it, or the sentence greatly varies with the purpose and spirit of the law. *People v. Woodson*, 2024 IL App (1st) 221172, ¶ 88.

¶ 33    Mr. Wideman was convicted of first degree murder, which carries a sentencing range of 20 to 60 years in prison. 730 ILCS 5/5-4.5-20(a) (West 2022). He was resentenced within that range to 30 years in prison. We give great deference to sentences that fall within the statutory sentencing range, but will find a within-range sentence is an abuse of discretion when the sentence "does not reflect an adequate consideration of [relevant] mitigating factors." *Woodson*, 2024 IL App (1st) 221172, ¶ 89. Where a court has considered the relevant mitigation factors, we may not substitute our judgment merely because we may have weighed them differently. *People v. Clark*, 2024 IL 127838, ¶ 76.

¶ 34    In addition to the general goal of imposing sentences according to both the seriousness of the offense and the objective of restoring the offender to useful citizenship, when sentencing a defendant who was under 18 years of age at the time of the offense, section 5-4.5-105(a) of the Code requires the court to consider the following factors in mitigation:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West Supp. 2023).

The purpose and spirit of section 5-4.5-105 is to rectify "the core concerns implicated when sentencing juvenile offenders" by ensuring that courts consider "how the inherent characteristics of youth diminish the usual penological justifications for imposing the harshest sentences." (Internal quotation marks omitted.) *Woodson*, 2024 IL App (1st) 221172, ¶ 89. However, in

sentencing a juvenile defendant, the court need not articulate each factor that it considered. *People v. Deleon*, 2025 IL App (1st) 211454, ¶ 56.

¶ 35 Initially, the State construes Mr. Wideman's argument as a claim that the court improperly imposed a life sentence under *Miller*, and argues that Mr. Wideman cannot succeed on that claim because his 30-year sentence is not a *de facto* life sentence under *Buffer*, 2019 IL 122327, ¶ 41. However, as Mr. Wideman notes, his claim is not that his sentence violates *Miller* but that the court abused its discretion by failing to adequately weigh the mitigating factors provided in section 5-4.5-105(a). Nevertheless, we find the trial court did not abuse its discretion.

¶ 36 A review of the record shows that the court considered the mitigating evidence Mr. Wideman identifies on appeal. At the resentencing hearing, the court stated that it had reviewed the record and read the mitigation report, and had to consider Mr. Wideman's "youthfulness at the time, his potential for rehabilitation, his lack of judgment at the time, and his progress since this incident." The court then noted that Mr. Wideman had received less than one ticket per year in prison, attended classes, worked, and "basically stayed out of trouble," which the court would balance against "the awful crime" he had committed. The court believed the 35-year sentence balanced the harm Mr. Wideman caused and acknowledged his "very, very, very troubled childhood," and that he had taken responsibility for his actions and "made strides" in turning his life around.

¶ 37 Then, at the hearing on Mr. Wideman's motion to reconsider the sentence imposed at resentencing, the court repeated that it had considered the record and, when imposing the sentence, considered Mr. Wideman's age and been aware that his act was impetuous. It noted he had been acting with a group of friends and there was no evidence indicating they had planned the offense.

It had considered that Mr. Wideman came from an abusive, neglectful environment, and it had "carefully considered" the mitigation report. Mr. Wideman had potential for rehabilitation, received certificates for completing classes, and had imperfect but "very good" behavior in prison. Mr. Wideman willingly participated in Mr. Thomas's beating but was not the "main actor." The court noted it was required to impose sentence with the goal of restoring Mr. Wideman to useful citizenship, and reduced his sentence to 30 years in prison.

¶ 38    Thus, the court explicitly considered nearly all of the factors provided in section 5-4.5-105(a): Mr. Wideman's age and impetuosity; whether he was subject to peer pressure or negative influences; his home environment, history of parental neglect and abuse, and childhood trauma; his potential for and evidence of rehabilitation; the circumstances of the offense; his role in the offense and lack of planning of the offense; and his expression of remorse. See 730 ILCS 5/5-4.5-105(a)(1)-(6), (9) (West Supp. 2023). Although the court did not cite the statute, much of the language it used mirrored the statute.

¶ 39    Moreover, although the court did not explicitly mention Mr. Wideman's limited juvenile criminal history (*id.* § 5-4.5-105(a)(8)), that information was included in the mitigation report that the court stated multiple times it had reviewed. See *Clark*, 2024 IL 127838, ¶¶ 75-76 (finding that the court considered the factors in section 5-4.5-105(a) where it stated it considered the evidence at trial, the presentence investigative report, and the evidence at sentencing, which included evidence relating to the factors); see also *Deleon*, 2025 IL App (1st) 211454, ¶ 56 (stating that the court need not articulate each factor it considers in rendering a sentence for a juvenile offender).

¶ 40    Mr. Wideman argues that the court failed to demonstrate on the record that it considered the statutory factors, and the general presumption that a court considered mitigating evidence

presented to it does not apply when considering compliance with section 5-4.5-105. We have stated otherwise. See *Deleon*, 2025 IL App (1st) 211454, ¶ 56 ("[T]he trial court need not articulate each factor it considers in rendering the sentence for a juvenile offender." (internal quotation marks omitted)). However, as Mr. Wideman notes, while his appeal was pending, an amendment to section 5-4.5-105 went into effect requiring courts to "specify on the record its consideration of the factors" in section 5-4.5-105(a). See Pub. Act. 103-191, § 10 (eff. Jan. 1, 2024) (amending 730 ILCS 5/5-4.5-105(b)).

¶ 41    Mr. Wideman urges that, although the version of section 5-4.5-105 enacted by Public Act 103-191 was not in effect during proceedings in his case, it should nevertheless guide us in ascertaining the legislature's intent behind the version of the statute that was in effect. See *People v. Salamon*, 2022 IL 125722, ¶¶ 116-18 (stating that an amendment to a statute provided guidance in ascertaining legislative intent behind former version of the statute). We do not believe the legislature's intent underlying Public Act 103-191 requires us to find that the court here failed to consider the factors in section 5-4.5-105(a) where the substance of the court's statements clearly indicated it did consider those factors.

¶ 42    Mr. Wideman further compares his case to *Woodson*, 2024 IL App (1st) 221172, where we reduced a sentence for first degree murder on appeal under similar circumstances, following a resentencing hearing to comply with *Buffer*. *Woodson* is distinguishable. There, the circuit court "failed to consider, or even mention, the significant testimony" about the defendant's "cognitive deficits" and "particularly limited adolescent capacity to understand the consequences of his actions." *Id.* ¶ 92. Moreover, the circuit court stated that the substantial evidence of the defendant's rehabilitation and conduct in prison did not "mitigate a murder." *Id.* ¶¶ 74, 94. The circuit court

therefore failed to consider multiple factors under section 5-4.5-105, which, we explained, was different than simply weighing the factors differently than we would have. *Id.* ¶ 100. Instead, the circuit court had demonstrated "undue preoccupation with retribution," which supported our holding that it failed to reasonably apply the mitigating factors applicable to juveniles. *Id.* ¶ 109.

¶ 43    In contrast here, as detailed above, the court's extensive discussion of evidence relating to nearly all the factors enumerated in section 5-4.5-105(a) shows that the court considered them in mitigation when ultimately reducing Mr. Wideman's sentence from 43 to 30 years in prison. As Mr. Wideman's juvenile history was included in the mitigation report, which the court stated multiple times it had read, the only factor which the record does not indicate the court considered was Mr. Wideman's ability to participate in his defense (730 ILCS 5/5-4.5-105(a)(7) (West Supp. 2023)), which Mr. Wideman does not argue is a basis for finding the court abused its discretion. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited.").

¶ 44    Moreover, the procedural posture of this case was such that the parties agreed to resentencing specifically for the court to consider Mr. Wideman's youth and attendant characteristics. The court was therefore apprised that Mr. Wideman's sentence required such considerations. See *Deleon,* 2025 IL App (1st) 211454, ¶ 50 (noting that the trial court knew its resentencing needed to include consideration of the defendant's youth where "[t]he matter came before the trial court for resentencing *specifically* due to the necessity of considering" the defendant's youth (emphasis in original)). The record shows that the court did, in fact, consider the mitigating factors set forth in section 5-4.5-105(a), and twice reduced the sentence based on that consideration.

¶ 45　In sum, the record shows that the court did not fail to consider the mitigating factors provided in section 5-4.5-105(a) and imposed Mr. Wideman's new sentence with due consideration of the seriousness of his offense and the goal of restoring him to useful citizenship. Accordingly, we find that the court did not abuse its discretion. Mr. Wideman's arguments to the contrary are, ultimately, a request that we reweigh the sentencing factors, which we will not do. *Clark*, 2024 IL 127838, ¶ 76. Therefore, we affirm his sentence.

¶ 46　For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 47　Affirmed.