2024 IL App (1st) 221172

FIFTH DIVISION
June 21, 2024

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-22-1172

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 03 CR 22400 |
| ANTONIO WOODSON, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justice Lyle concurred in the judgment and opinion.
Presiding Justice Mitchell dissented, with opinion.

**OPINION**

¶ 1    In 2017, defendant Antonio Woodson filed a *pro se* postconviction petition challenging the constitutionality of a 60-year sentence he received for convictions arising out of events occurring when Mr. Woodson was a juvenile. The circuit court summarily dismissed the petition. This court entered an agreed order, reversing and remanding for a new sentencing hearing in compliance with *People v. Buffer*, 2019 IL 122327, and section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2018)). *People v. Woodson*, No. 1-17-0887 (2019).

¶ 2    On remand, the circuit court gave Mr. Woodson the same sentence without the add-on for use of a firearm, which has since become discretionary for persons convicted of crimes committed

when they were juveniles (730 ILCS 5/5-4.5-105(c) (West 2022)), for an aggregate sentence of 40 years. On appeal, Mr. Woodson argues the new sentence imposed is excessive and that the circuit court failed to reasonably apply relevant mitigating factors associated with youth and required by section 5-4.5-105. Mr. Woodson also argues the circuit court deprived him of his right to due process by failing to provide a fair sentencing hearing. Because we agree that the circuit court abused its discretion by failing to reasonably apply the relevant mitigating factors, we modify the sentence imposed.

¶ 3                                      I. BACKGROUND

¶ 4                                           A. Trial

¶ 5     In April 2006, Mr. Woodson was sentenced to 60 years of imprisonment for vehicular hijacking, personally discharging a firearm, and the first degree murder of Jimmy Patton, based on events occurring on January 11, 2003. We summarize the facts of that day as presented at Mr. Woodson's trial only as necessary to understand the current appeal.

¶ 6     At trial, Arthur Newby testified that on January 11, 2003, he was with Robert Hughes (Mr. Woodson's cousin), Dante White, Joshua Council, and Mr. Woodson at a home that was "about a couple of blocks away" from Garfield Park. Mr. Newby heard Mr. Woodson and Mr. Council having a conversation about going to a park to "carjack somebody." The two then left the home with Mr. Hughes and Mr. White.

¶ 7     Steven Banks testified that, on the same day, he drove to Garfield Park to spend time with his friends J.C. Parker and Jimmy Patton. Mr. Banks parked his car in an area of the park known as "the circle." The three men spent time "relaxing" in Mr. Parker's parked car when several young men wearing hoods over their heads approached. According to Mr. Banks, one tapped on the window and asked for a light. Mr. Patton exited the vehicle and walked to his adjacent parked car.

¶ 8      Two of the young men then began to wrestle Mr. Patton's keys from him. Mr. Banks noticed that a third young man had a gun. Mr. Banks asked Mr. Patton to return to the car, but Mr. Patton did not. Mr. Parker and Mr. Banks then "peeled off." When they were about 50 feet away, Mr. Banks heard gunshots. The two men flagged down a police officer and returned to the area. Upon returning, Mr. Banks saw that Mr. Patton was lying face up on the sidewalk.

¶ 9      According to Mr. Newby, Mr. Woodson and his three companions returned to the house about an hour after they had departed. They appeared "scared" and "shook up." Mr. Woodson told Mr. Newby that he had shot someone "in the chest." An autopsy established that Mr. Patton died from a gunshot wound to the heart.

¶ 10    Detectives John Roberts and Greg Swiderek also testified. They stated that, after interviewing Mr. White, Mr. Council, Mr. Newby, and Mr. Hughes in connection with Mr. Patton's death, they suspected Mr. Woodson and were looking for him.

¶ 11    On September 7, 2003, Mr. Woodson presented himself to a police station with his mother and two grandparents. Detectives Swiderek and Roberts arrested Mr. Woodson and began to question him about the shooting that had occurred on January 11.

¶ 12    Mr. Woodson initially admitted to being with Mr. Council, Mr. White, and Mr. Hughes in Garfield Park on the night in question, but he claimed that Mr. Council had committed the shooting and that he had not seen it because he ran away.

¶ 13    Detective Swiderek then told Mr. Woodson that he believed that he was lying. The detective played two video recordings of statements made by Mr. Council and Mr. Hughes. After watching their statements, Mr. Woodson admitted to shooting Mr. Patton.

¶ 14    Mr. Woodson then made a videotaped statement that was played for the jury at trial. In the statement, Mr. Woodson admitted that he, Mr. Council, Mr. White, and Mr. Hughes were at a party

at Mr. Woodson's grandmother's home when they agreed to steal a car from a park. On their way to Garfield Park, Mr. Woodson sat on a bench while Mr. White and Mr. Council discussed which car the boys were going to take. The two selected a gold vehicle parked next to a burgundy car. At that point, Mr. Council "passed [Mr. Woodson] the gun."

¶ 15    The four boys approached the parked cars. Mr. Council asked the men in the burgundy vehicle "where is my uncle with his car." A moment later Mr. Council changed his question and asked for a cigarette.

¶ 16    A man seated in the back seat of the burgundy car exited the vehicle, walked to the passenger door of the gold car, and removed the key from the ignition before responding. The man stated, "what did you want. You don't want no fucking cigarette so what do you want."

¶ 17    At that point, Mr. Council looked at Mr. Woodson "like, do you got that, do you got me," by which he meant "do you got my back, do you have the gun?" Mr. Woodson pulled the gun out of his hoodie pouch, pointed it at the man, and "clicked it," but it did not go off. He then "clicked it again," and it fired.

¶ 18    After the shooting, Mr. Woodson just "stood there." The transcript of his statement records him saying "I was shocked. I was sorry what happened. It didn't [*sic*] mean like that. I didn't know it was gonna go like that." The shooting "was an accident."

¶ 19    Mr. Woodson then ran with Mr. Hughes back in the direction of their grandmother's house. Mr. White and Mr. Council caught up with the two of them while driving Mr. Patton's car. According to his statement, Mr. Woodson got in the car "cause I was so scared, I just wanted to go. I was shaking. I was nervous."

¶ 20    When Mr. Woodson arrived back at his grandmother's house, he wrapped the gun in a shirt and Mr. Council came over soon after to retrieve it. Mr. Woodson said in his statement that he told

Mr. Council, "you was wrong cause you did not tell me the gun was loaded."

¶ 21 When asked if he told anyone about what had happened, Mr. Woodson replied, "[n]o sir. That's, that's nothing to be bragging about. Cause that was a horrible thing what happened cause it happened so fast. And it just—it ain't, it ain't nothing to be bragging about." When asked why he came to the police station that day, Mr. Woodson replied, "[t]o tell the truth."

¶ 22 The jury found Mr. Woodson guilty of first degree murder and vehicular hijacking and that he personally discharged a firearm.

¶ 23                                    B. Initial Sentencing Hearing

¶ 24 Mr. Woodson's initial sentencing hearing was held on April 5, 2006.

¶ 25 In aggravation, the State called Officer Fred Bradley of the Riverdale Police Department to describe the only criminal charge in Mr. Woodson's background, which was a charge of misdemeanor battery based on an incident that had occurred the day before Mr. Woodson turned himself in to the police.

¶ 26 Suzette Patton, Mr. Patton's wife, read a victim impact statement. She described the pain of losing her husband, the financial difficulties she endured without his income, and the challenges Mr. Patton's granddaughter faced without her grandfather.

¶ 27 Mr. Woodson's mother, Frances, spoke in mitigation. She described that Mr. Woodson had a learning disability, was a "good kid," and did not complete the eleventh grade. When Mr. Woodson was still a child, she was diagnosed with a brain tumor and spent "27 days" out of the average month in the hospital. She testified that she and Mr. Woodson's maternal grandparents ensured that he attended church.

¶ 28 The court imposed a sentence of 30 years for the murder of Jimmy Patton, an additional 20 years for personally discharging a firearm—which was a mandatory part of the sentence at that

time (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2002))—and a consecutive 10-year term for vehicular hijacking, for an aggregate sentence of 60 years.

¶ 29                           C. Resentencing Proceedings

¶ 30    In 2017, Mr. Woodson filed a *pro se* postconviction petition challenging the constitutionality of his *de facto* life sentence. The circuit court summarily dismissed that petition, and Mr. Woodson appealed. On June 17, 2019, this court entered an agreed order reversing the circuit court and remanding for a new sentencing hearing in compliance with *Buffer*, 2019 IL 122327, and section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2018)). *Woodson*, No. 1-17-0887 (2019).

¶ 31    The circuit court received the following materials in advance of Mr. Woodson's resentencing hearing.

¶ 32                           1. *Presentence Investigation Report*

¶ 33    A new presentence investigation report was given to the court. That report stated that Mr. Woodson had no prior convictions or juvenile adjudications. A box was checked indicating that Mr. Woodson had been charged with a misdemeanor, which his lawyer explained was the battery that Officer Bradley had testified to at the initial hearing and that had never been prosecuted.

¶ 34    The report stated that Mr. Woodson acknowledged that he had been in the Black Disciples but was no longer gang involved. Mr. Woodson had been in special education classes from first grade on because he was a "slow learner." He graduated from junior high school but only continued in school through tenth grade. He enrolled in 2022 with Job Corps, a residential education and job training program for young adults, but did not complete it. Mr. Woodson acknowledged that he started drinking alcohol at age 11 and smoked marijuana every day.

¶ 35    Mr. Woodson's mother remarried, and Mr. Woodson did not "like his stepfather." His

father was "in and out of [Mr. Woodson's] life," but in 1998 they "got a chance to develop a relationship." The report noted that Mr. Woodson had one son, Jaylan Alexander, whom he called "often to maintain a good relationship." His family was "disappointed with his trouble with the law" but remained supportive.

¶ 36                              2. *Neuropsychological Evaluation*

¶ 37    Dr. Robert Hanlon, Ph.D., is a professor of psychiatry and neurology and a board-certified clinical neuropsychologist at Northwestern University's Feinberg School of Medicine. He performed a 10-hour neuropsychological evaluation of Mr. Woodson and submitted his findings.

¶ 38    According to Dr. Hanlon, the brain undergoes a series of changes during adolescence that are not completed until the "mid-20s." The most significant changes "occur in the frontal lobes, particularly the prefrontal cortex," which is crucial to the development of executive functions, including "response inhibition, emotional control, and the understanding of the future consequences of behavioral acts." Adolescents consequently engage in "seemingly thoughtless behaviors." According to research Dr. Hanlon cites, "[o]nly a relatively small proportion of adolescents who engage in criminal behavior develop chronic, antisocial criminal lifestyles into adulthood."

¶ 39    Dr. Hanlon then described Mr. Woodson specifically. He wrote that Mr. Woodson sustained "[c]losed head trauma *** at age 5 when he was struck by a motor vehicle as a pedestrian." At age 10, Mr. Woodson spent most of his time "hanging out in the streets with [his] friends." He began smoking "3 blunts per day" and gradually increased the dose until he was smoking "10-15 blunts per day" by age 15.

¶ 40    Dr. Hanlon wrote that Mr. Woodson's "[c]ognitive functions *** were defective and generally consistent with *** Borderline Intellectual Functioning." Mr. Woodson's intelligence

quotient (IQ) was 74, corresponding to the fourth percentile.

¶ 41    Mr. Woodson scored a "6" on the "Psychopathy Checklist-Revised," "which was in the very low range and [did] not reflect psychopathy." He demonstrated "insight regarding [his adolescent] immaturity" and accepted "blame for his impulsive adolescent behavior that resulted in the death of Jimmy Patton." Dr. Hanlon wrote that, although prediction of future violence is "extremely difficult," "Antonio Woodson possesses very few behavioral factors"—like substance use, a history of physical abuse, or an inability to maintain healthy relationships—"that are associated with a high risk of recidivism."

¶ 42    Dr. Hanlon received information from Mr. Woodson about the day of Mr. Patton's death. Mr. Woodson started smoking and drinking with his friends around 10 or 11 a.m. They drank two bottles of brandy and smoked 10 blunts. Mr. Woodson pulled the gun "as a scare tactic." He then tried to shoot in the air, but it didn't fire. Mr. Woodson only shot at Mr. Patton after Mr. Patton "ran at [him]," and even then, he aimed to shoot past him but missed.

¶ 43    The neuropsychological evaluation included a statement of remorse. Mr. Woodson reportedly said "I'm very sorry for the life that was taken. It was wrong. I was immature. I'm truly sorry for what happened. I hope [the Patton family] can forgive me."

¶ 44                                    3. *Mitigation Report*

¶ 45    Amanda Myers, a licensed clinical social worker, prepared a mitigation report for the defense. The report's citations indicate that Ms. Myers interviewed Mr. Woodson, multiple family members, childhood friends, and associates. She also reviewed Dr. Hanlon's report, documents produced by Chicago Public Schools, the Department of Corrections (IDOC), support letters, and victim impact statements.

¶ 46    Ms. Myers wrote that Mr. Woodson, as a child, showed signs of a "severe intellectual

disability and learning delays." A week after he was born, Mr. Woodson had difficulty breathing, and an ambulance was called. Upon arrival, "they pronounced him dead, but they were able to revive him soon after." Mr. Woodson began to experience heart murmurs and was placed on a monitor. Mr. Woodson's mother later qualified for disability benefits for raising a disabled child.

¶ 47 A psychiatrist evaluated Mr. Woodson and wanted to prescribe Ritalin to treat attention deficit hyperactivity disorder. Mr. Woodson's mother, however, refused the treatment.

¶ 48 When Mr. Woodson was "about 12 years old, [his mother] was diagnosed with cerebrovascular accidents due to tumors found in her brain." The diagnosis forced her to enter the hospital for about a year, and all five of her children were split up. She then suffered from migraines, poor vision, and "numerous strokes." Ms. Myers concluded that Mr. Woodson's mother "definitely did not have the time nor energy to supervise Antonio."

¶ 49 As a child, Mr. Woodson never stayed in one residence for more than five months, after which he would usually feel "trapped" and would leave. He lived with his mother, his grandmother, his great aunt, and his godmother. Around 1999, Mr. Woodson also intermittently lived with his father, who was a leader of the Gangster Disciples and was in "jail a lot." Mr. Woodson had few memories of his father besides the two of them smoking marijuana together.

¶ 50 Mr. Woodson tried to "straighten up his life after [his] son was born." He enrolled in Job Corps in the eleventh grade. Ms. Myers reported that Mr. Woodson "did not feel comfortable" and "ended up leaving the program before completing it."

¶ 51 Ms. Myers's mitigation report included a reentry plan. The plan describes that Mr. Woodson could gain employment through multiple channels, including his uncle who owned a landscaping business, a childhood friend from church who offered to send Mr. Woodson to trucking school, and a separate friend who said he would "absolutely be able to get Antonio a job

at the steel mill where he [was] employed."

¶ 52    Ms. Myers concluded her report by saying, "Antonio is a different person now than [who] he was at 17." She also emphasized, "[i]n the 15 years that this mitigation specialist has worked on sentencing advocacy and mitigation cases, there has never been a case such as Antonio's that seemed so clear that a life—Antonio's life—would be better spent for the greater good of society at home with his family." When defense counsel mentioned Ms. Myers's report during his opening statement, the court asked, "[w]hat's the—what's the—finest people [Ms. Myers] ever interviewed?"

¶ 53                    4. *Testimony at Resentencing Hearing*

¶ 54    On July 1, 2022, the circuit court conducted the resentencing hearing. The court reported that it had read "every single line" of Mr. Woodson's document file.

¶ 55    In aggravation, the State introduced the previously described victim impact statement of Suzette Patton and read it into the record. Tina Patton, Mr. Patton's niece, also read a victim impact statement on behalf of the Patton family. Jimmy Patton Jr. identified himself in court and informed the judge that he was Mr. Patton's son and was 23 years old when his father was killed.

¶ 56    In mitigation, the defense called three witnesses, correctional officers Patricia Brown-Conley and Henry Peaks, and the former director of the IDOC, Salvador Antonio Godinez.

¶ 57    Both officers testified that they met Mr. Woodson in 2019 when he was remanded to the Cook County Department of Corrections for resentencing. Ms. Brown-Conley observed Mr. Woodson "voluntarily doing work around the tier," and she decided to ask him to work for her. He cleaned the restroom and dayroom and worked in the barbershop, a trusted position because of access to tools "like screwdrivers that people could be stabbed with *** [and] blades that people can be cut with." He was a "great" worker.

¶ 58    Officer Peaks testified similarly. He stated that Mr. Woodson was his "number one barber" and helped him with reports, inventory, and "that type of stuff" in addition to cutting hair. During the pandemic, the barbershop was shut down, but Mr. Woodson continued to work in both sanitation and in the kitchen. He sometimes worked from 4 a.m. to 8 p.m.

¶ 59    Mr. Woodson completed over 1500 hours of training in a prison-sponsored barber's college, earning a certificate. Ms. Brown-Conley explained that not everyone who fulfills the hourly requirement qualifies. The certificate is "based on your skills. It's based on your attitude. It's based on your professionalism and Antonio was one of the guys that exemplified it."

¶ 60    Officer Brown-Conley stated that, in her approximately 15-year career, she had only testified for one other individual in a sentencing hearing. In the 18 years that Officer Peaks worked as a correctional officer, he too had only testified one other time on behalf of an inmate. When Officer Peaks was asked if, other than the other inmate for whom he testified, had he ever "encountered an inmate as trustworthy and hardworking and well-behaved as Antonio Woodson," he replied, "[a]bsolutely not."

¶ 61    Ms. Brown-Conley testified to having the same experience. She added that she had selected Mr. Woodson for a "special assignment" called "the dog run," during which an inmate walks "on the outside." Ms. Brown-Conley selected Mr. Woodson because he "exemplified things that I looked for in inmates. I don't just pull an inmate or a detainee with me. They have to show me that they're a stand-up person." The court asked if Officer Brown-Conley would expect people to "act nice" while awaiting resentencing. Ms. Brown-Conley responded, "[w]ell we expect them to, but on a daily basis, they don't."

¶ 62    Defense counsel next called Salvador Antonio Godinez, the former governor-appointed director of the IDOC. To prepare for his testimony, Director Godinez interviewed Mr. Woodson,

spoke with the warden at Stateville Correctional Center, interviewed the unit superintendent overseeing Mr. Woodson's division, and reviewed Mr. Woodson's disciplinary record and transfer history. Director Godinez testified as an expert retained on behalf of Mr. Woodson.

¶ 63    Director Godinez testified that, in 2006, after sentencing, Mr. Woodson was sent to Menard Correctional Center in southern Illinois. At the time, Menard "had the highest rate of writing disciplinary tickets." During the roughly 12 years Mr. Woodson lived there, his disciplinary record was "almost immaculate." Director Godinez stated, "I was shocked. *** I looked very hard, and in his entire stay in the [IDOC], he's had *** four disciplinary tickets." Three of those tickets were at Menard, and none were for serious infractions. Director Godinez testified that a disciplinary record like that was "extremely unusual" because younger inmates often "battle" staff before adjusting to the prison's regulated environment. The court asked "[i]s something wrong about [Menard's] strict policies," and Director Godinez replied that there was not but that the strictness provided context for understanding why Mr. Woodson's behavioral record was surprising.

¶ 64    Director Godinez was similarly impressed with Mr. Woodson's work history. He stated that "the system" prioritized work opportunities for shorter-term inmates. It therefore required "some initiative on the individual's part, a lot of initiative," to obtain work. Mr. Woodson, however, began working his first day in the IDOC, eventually as a barber, and also in the officer's kitchen. The latter position was a "high honor" reserved for "minimum security classified inmates" with lower sentences because of the access to weapons like knives and forks. Director Godinez explained Mr. Woodson likely obtained that position because he developed a relationship with someone who saw "the work that he was providing" and gave him a chance. The court asked, "if he got those jobs, he was treated pretty well, correct?" Director Godinez replied, "I think it went both ways. That he was doing very well and he was treated very well." Director Godinez was

impressed that, if he remembered correctly, Mr. Woodson earned 17 certificates while in prison.

¶ 65    Director Godinez further testified that it "very much surprise[d]" him that Mr. Woodson was not affiliated with a gang. In Director Godinez's words, "it almost behooves" an inmate to remain in or else enter a gang to receive "special privileges" and protection. "I have to ask myself, how does a 20-year-old get through Menard without that. I don't know."

¶ 66    According to Director Godinez, Mr. Woodson expressed remorse for the death of Mr. Patton, saying "I did it, I regret I did it, I don't understand why I did it, I was not mature." Director Godinez remarked that, if there were boxes to check to demonstrate rehabilitation, Mr. Woodson "would check all the boxes."

¶ 67    During his testimony, he mentioned that the IDOC made several policy changes as a result of the imprisonment of Richard Speck, a convicted murderer of eight nurses "a long time ago," including prioritizing shorter-term inmates for work assignments. Before the State's cross-examination, the court interjected to ask if Director Godinez knew whether Mr. Speck had been "turned around inside," if Mr. Speck "became a queen," and if Director Godinez had seen a video about that subject. The director answered no to these questions, and the State then proceeded with cross-examination.

¶ 68                    5. *Mr. Woodson's Allocution Statement*

¶ 69    Mr. Woodson read a statement in allocution. He described his former self, saying "[I] wanted to hang in the streets with my friend[s] on the block. But because of [what happened] back then, I realized that I had to change." "My past help[ed me] to become mindful *** [of] who to associate with and to help pull myself around." In terms of remorse, he stated, "I have and will always live with my actions for the rest of my life." "I have prayed for God's forgiveness," and "I am here today to apologize to the Patton family and ask [for their] forgiveness." Mr. Woodson

13

concluded that he found purpose in barbering and hoped to leave prison to "help young boys and girls and urban communities to help them stay in school and mentor them through any adversities they are having."

¶ 70                              6. *Court's Discussion of Parole*

¶ 71    The court had a discussion with Mr. Woodson's lawyer prior to the sentencing hearing and then a later conversation with Mr. Woodson in which it appears that the court took the position that Mr. Woodson would only be eligible for parole if he elected to be sentenced under current law but that, because of the possibility of parole, *Miller* would also not bar a life sentence, allowing the court to resentence Mr. Woodson to his original 60 years. Mr. Woodson, on the record, elected to be sentenced under the "old law."

¶ 72                      7. *Resentencing and Motion for Reconsideration*

¶ 73    After hearing argument from both the State and defense, the court gave lengthy remarks prior to imposing Mr. Woodson's sentence.

¶ 74    The court first spoke in general about how it did not believe Mr. Woodson's suggestion in his statement to the police that the killing was a kind of accident. The court then noted that its understanding was that the maximum sentence it could impose was 40 years. It stated that Mr. Woodson "did well in prison" but asked "how does that mitigate a murder?" The court then found that the crime did not involve peer pressure because Mr. Woodson "hardly knew" two of the guys from the night in question.

¶ 75    Next, the court described its justification for its sentence saying, "I have no beef with Antonio Woodson whatsoever. I don't dislike Antonio Woodson. I dislike what he did however." The court added "[when you] do bad things you have bad consequences." The court talked about the victim's family and contrasted Mr. Woodson's behavior in prison with his behavior on the

14

night of the crime, saying Mr. Woodson might be a "nice guy" but what the court saw was Mr. Woodson with "a gun in his hand."

¶ 76    The court asked the State if the *Miller* factors were what it had to consider in imposing a sentence higher than 40 years or "just in general." The State responded that the court was required to consider all factors "in mitigation in crafting an appropriate sentence." The State then handed the court a list of the statutory factors, and the court turned to the statute. It went on to comment on age, potential for rehabilitation, impetuosity, level of maturity, family history, and prior criminal activity. The court found none of the factors were significantly mitigating. Mr. Woodson was almost 18, the conduct was not impetuous because the boys went to the park intending to steal a car, and Mr. Woodson "came from a family that wasn't the greatest."

¶ 77    In terms of rehabilitation, the court repeated the gist of what it said previously: "Doing well in a custodial setting *** I'm not sure how that goes to rehabilitation or not." Mr. Woodson's behavior "could just be a way to release [him from] boredom." The court concluded: "we'll give him a little mark, half mark on that one."

¶ 78    On remorse, the court concluded the following:

"I don't see when a guy gives you all these different versions of what happened and gets up years later [after] going back to prison, [and then says] [']oh, ma[n], I'm sorry I did it.['] I think Woodson may be sorry, not that he shot the man. He's going to prison for a long time. That's what he may be sorry about."

¶ 79    After listing and providing these comments on the statutory factors, the court remarked on Mr. Patton's family's significant loss. The court then turned to *Miller v. Alabama*, 567 U.S. 460 (2012), noting that the United States Supreme Court remanded that case for a new sentencing but the 14-year-old offender at issue there still received a life sentence.

15

¶ 80    The court sentenced Mr. Woodson to 30 years of imprisonment for first degree murder followed by a consecutive 11-year sentence for vehicular hijacking, for which Mr. Woodson could earn good time credit. The court noted that the sentence would be followed by three years of mandatory supervised release.

¶ 81    Mr. Woodson filed a motion to reconsider, pointing out that the court had increased the sentence on vehicular hijacking from 10 to 11 years in violation of section 5-5-4 of the Code, which prohibits imposing a more severe sentence on remand except where it is based on conduct occurring after the offense. 730 ILCS 5/5-5-4 (West 2022). Mr. Woodson also argued that the court improperly considered in aggravation matters implicit in the offense, failed to consider all of the factors required by section 5-4.5-105 of the Code, handed down an improperly disparate sentence compared to his codefendants, and penalized him for exercising his right to trial.

¶ 82    On July 14, 2022, the court agreed that it had improperly increased the sentence on vehicular hijacking and reduced it to 10 years. In all other respects the circuit court denied the motion to reconsider. Thus, the final sentence that Mr. Woodson received was identical to the one he was given in 2006, except that it did not include the firearm enhancement, which is no longer mandatory for defendants under the age of 21 at the time of the crime. *Id.* § 5-4.5-105(c).

¶ 83                                 II. JURISDICTION

¶ 84    The circuit court ruled on Mr. Woodson's motion for reconsideration on July 14, 2022, and Mr. Woodson timely filed his notice of appeal from that order the same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 85                                III. ANALYSIS

¶ 86    On appeal, Mr. Woodson makes two claims: (1) that his sentence is excessive considering the extensive mitigation evidence presented and (2) that the circuit court failed to provide a fair sentencing hearing. In our view, these are in fact two arguments in support of Mr. Woodson's claim that the sentence is excessive, but we address each argument in turn.

¶ 87                              A. Excessive Sentence

¶ 88    The question of whether a sentence is excessive is reviewed for an abuse of discretion. *People v. Maldonado*, 240 Ill. App. 3d 470, 485 (1992). Although courts have discretion in imposing sentences within the applicable statutory limits, this discretion " 'is not unfettered.' " *People v. Haley*, 2011 IL App (1st) 093585, ¶ 65 (quoting *People v. O'Neal*, 125 Ill. 2d 291, 297 (1988)). An abuse of discretion occurs where the circuit court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it (*People v. McGath*, 2017 IL App (4th) 150608, ¶ 55) or where a sentence greatly varies with the purpose and spirit of the law (*Haley*, 2011 IL App (1st) 093585, ¶ 65).

¶ 89    The purpose and spirit of section 5-4.5-105 of the Code is to "rectify[ ] the core concerns implicated when sentencing juvenile offenders" as addressed by *Miller* and its progeny. *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 42. *Miller*, in turn, made clear that courts must consider how the inherent characteristics of youth diminish the usual "penological justifications for imposing the harshest sentences." *Miller*, 567 U.S. at 472-73. Section 5-4.5-105 of the Code adopts the factors enunciated in that case and makes them applicable to all sentences for crimes committed when the defendant is under 18. 730 ILCS 5/5-4.5-105 (West 2022); *People v. Morris*, 2023 IL App (1st) 220035, ¶¶ 57-59. While we accord great deference to any sentence that falls within the statutory sentencing range, this court will find an abuse of discretion when that sentence does not

reflect an adequate consideration of these mitigating factors. *Cavazos*, 2023 IL App (2d) 220066, ¶ 73; see *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 86 ("We are not meant to merely be a rubber stamp for the sentencing decisions of the trial courts.").

¶ 90    The statute requires that, in sentencing individuals who are under 18 at the time of the commission of the offense, the court

"shall consider the following additional factors in mitigation in determining the appropriate sentence:

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." 730 ILCS 5/5-4.5-105(a) (West 2022).

¶ 91    We find that the circuit court in this case abused its discretion by failing to fully apply these

18

factors to the specific facts relevant here and impose a sentence within the purpose and spirit of the law regarding sentencing juveniles. Of the nine listed factors, we find factors one and four particularly important.

¶ 92    Concerning the first factor—the person's age, impetuosity, capacity to consider the consequences of his or her behavior, and the presence of a cognitive or developmental disability— the court did not find the factor mitigating because the carjacking was planned and was therefore not impetuous. The court, however, failed to consider, or even mention, the significant testimony presented about Mr. Woodson's cognitive deficits. Mr. Woodson's mother received disability benefits for raising a disabled child. Mr. Woodson was enrolled in special education classes, he suffered from an untreated hyperactivity disorder and cannabis dependency, his IQ was considered "borderline," and he survived head trauma as a child. Moreover, Dr. Hanlon testified that the adolescent brain has an inherently diminished capacity to consider consequences. We are unable to find a place in the record where the circuit court considered the above testimony when determining the mitigating effects of this factor. Instead, the court emphasized the fact that the carjacking was planned. This factor, as enunciated in the statute, is broader. The court appears to have given no consideration to Mr. Woodson's particularly limited adolescent capacity to understand the consequences of his actions.

¶ 93    Of the nine *Miller* factors, evidence concerning the fourth factor, Mr. Woodson's rehabilitation, was the most overwhelming. The statute specifically references both potential for rehabilitation and "evidence of rehabilitation." 730 ILCS 5/5-4.5-105(a)(4) (West 2022). Such evidence is not always available, but it was here. Mr. Woodson earned 17 certificates in prison, obtained his barber's license, demonstrated a strong work ethic from his first day in the IDOC through his second sentencing hearing, and was a model inmate. He received a total of four tickets,

all for minor infractions, in his 16-plus years in the IDOC, which prison personnel viewed as extraordinary. He avoided gang affiliation, worked in the staff kitchen, earned positions with access to screwdrivers and blades, and was selected for special assignments. In his allocution statement, Mr. Woodson articulated a strong sense of purpose and demonstrated self-awareness about how his criminal conviction caused him to both change his life and avoid negative influences in prison.

¶ 94    Despite the substantial rehabilitation evidence, the circuit court's response was that none of that "mitigate[s] a murder." In the court's words, "one would expect a guy in custody to try and do well," and "I'm not sure how [doing well in prison] goes to rehabilitation or not." In the court's view, Mr. Woodson's behavior "release[d] [him from] boredom" and only deserves "half a mark." The circuit court acknowledged, as it had to, given the extensive testimony and documentary evidence, that Mr. Woodson "did well in prison." The problem is not that the court ignored the evidence but rather that it deliberately and unreasonably discounted it.

¶ 95    This court has recognized that unreasonably discounting evidence of rehabilitation can be an abuse of discretion. In *McKinley*, 2020 IL App (1st) 191907, the defendant was convicted of first degree murder as a 16-year-old and sentenced originally to 100 years' imprisonment. During a resentencing hearing pursuant to a postconviction petition, two correctional sergeants testified to the defendant's good character. *Id.* ¶¶ 28-29. One described how the defendant worked as a porter in his cell house for at least a year and a half, "which was rare" and constituted evidence of a special working relationship with staff. *Id.* ¶ 29. The defendant did not have any tickets from that jail. *Id.* ¶ 36. He also did well in prison education programs, showing leadership potential in programs sponsored by Northwestern University, DePaul University, and Northeastern Illinois University. *Id.* ¶¶ 30-43.

20

¶ 96     Despite all of this, the "only comments on [the] defendant's rehabilitation" that the circuit court made were that " 'he does have rehabilitative potential,' " his " 'conduct in the penitentiary had been admirable,' " and he was " 'recognized for some leadership traits within the Illinois Department of Corrections.' " *Id.* ¶ 78. The circuit court went on to sentence the defendant to 39 years. *Id.* ¶ 80.

¶ 97     In that case, we held that the "trial judge's brief, general references to defendant's rehabilitation indicate that the trial judge disregarded the extent of defendant's rehabilitation and did not afford it adequate weight." *Id.* ¶ 78. We recognized that the defendant was "the epitome of an offender who ha[d] been restored to useful citizenship." *Id.* ¶ 79. His sentence, however, "failed to give proper weight to [the] defendant's extensive rehabilitation evidence." *Id.* ¶ 80. As our comments demonstrate, a sentencing judge may make a specific reference to a statutory factor and yet improperly discount it where the sentence does not "reflect" (*id.* ¶ 79) the "extensive *** evidence" (*id.* ¶ 80) presented concerning that factor.

¶ 98     Here, the circuit court specifically afforded Mr. Woodson only "half a mark" on rehabilitation, despite Mr. Woodson's more than 16 years of continuous work in the IDOC. Like the defendant in *McKinley*, Mr. Woodson pursued educational opportunities, earned special privileges, and avoided antisocial influences. Moreover, Mr. Woodson was trained and worked as a barber, overcoming not only prison life but any cognitive deficits with which he may struggle. He earned the trust of two correctional officers who testified on his behalf, as well as a mitigation specialist who stated that, in her 15 years of practice, she had never come across an individual whose life would be better spent in society than Mr. Woodson's. The former director of the IDOC testified that, if boxes existed to demonstrate rehabilitation, Mr. Woodson would check them all. Despite all of this, the circuit court sentenced Mr. Woodson to 40 years of imprisonment. As we

did in *McKinley*, we believe the circuit court "disregarded the extent of defendant's rehabilitation and did not afford it adequate weight." *Id.* ¶ 78.

¶ 99 The State notes that "[a] defendant's rehabilitative potential *** is not entitled to greater weight than the seriousness of the offense" (internal quotation marks omitted) (citing *People v. Alexander*, 239 Ill. 2d 205, 214 (2010)) and that a reviewing court must not substitute its own judgment for that of the circuit court just because the reviewing court would weigh the factors differently (citing *People v. Stacey*, 193 Ill. 2d 203, 209 (2000)). We agree that few crimes are as serious as murder and that the circuit court was therefore right to consider the gravity of the crime and Mr. Woodson's central role in it. But, as we have recognized, " 'murders vary in their gravity and in the information they reveal concerning the likelihood of recidivism by the murderer.' " *McKinley*, 2020 IL App (1st) 191907, ¶ 18 (quoting *McKinley v. Butler*, 809 F.3d 908, 913-14 (7th Cir. 2016)).

¶ 100 The Illinois Constitution requires that all sentences "be determined both according to the seriousness of the offense *and* with the objective of restoring the offender to useful citizenship." (Emphasis added.) Ill. Const. 1970, art. I, § 11. Undue emphasis on either aggravation or mitigation may be an abuse of the court's discretion in sentencing when, in its extreme application, it amounts to disregard. As we recognized in *McKinley*, the inherent characteristics of youth diminish a juvenile's capacity to consider repercussions and therefore decrease the penological justification for the harshest of sentences, even for the most serious of crimes. *McKinley*, 2020 IL App (1st) 191907, ¶ 58 (citing *Miller*, 567 U.S. at 472). The circuit court's failure to consider multiple *Miller* factors does not therefore represent a situation in which we as the reviewing court would simply weigh the factors differently. Like *McKinley*, it represents a situation in which the circuit court failed to balance the seriousness of the offense with the constitutionally mandated

requirement of rehabilitation.

¶ 101   The State distinguishes *McKinley*, pointing out that the court there improperly treated peer pressure as aggravation, when the statute requires that it be considered in mitigation. *Id.* ¶¶ 88-89. But the essence of *McKinley*, which is equally applicable here, is that the circuit court "disregard[ed] evidence of defendant's extensive rehabilitation and improperly consider[ed] [the] sentencing factors during the resentencing hearing." *Id.* ¶ 91. In Mr. Woodson's case there is the added consideration that Mr. Woodson had learning deficits that made him particularly unable to appreciate the significance of his actions when he was still a juvenile.

¶ 102   The State points out that the circuit court gave Mr. Woodson a sentence significantly below the 95 years that the law at the time of the crime would have allowed. The dissent also finds this compelling. As our supreme court has recognized, however, a sentence longer than 40 years is a *de facto* life sentence, which means the defendant is likely to die in prison. *Buffer*, 2019 IL 122327, ¶ 40. Thus, while a 95-year sentence may sound a great deal harsher than a 40-year sentence, the reality is that, at the 40-year mark, any additional years are almost meaningless.

¶ 103            B. Failure to Provide Due Process at the Sentencing Hearing

¶ 104   Mr. Woodson makes an additional argument that the circuit court deprived him of due process by failing to provide him with a fair sentencing hearing. Specifically, he contends that the circuit court (1) prejudged his case and the sentence that should be imposed, (2) interjected its own personal beliefs or facts not in evidence, and (3) wrongly admonished Mr. Woodson that, as long as he was eligible for parole, a sentence of 40 years or more would not constitute a *de facto* life sentence. We address the first two arguments together before turning to the third.

¶ 105   In support of these first two contentions, Mr. Woodson cites points in the record where the court discussed irrelevant information or interjected one-sided questions. Examples include the

court's commentary on Mr. Speck's sexuality and questions like "you'd expect [someone in prison] to act nice while he was there," "[i]s something wrong about [Menard's] strict policies," "if [Mr. Woodson] got those jobs, he was treated pretty well, correct," and "[w]hat's the—what's the—finest people [Ms. Myers] ever interviewed?" Mr. Woodson also cites the court's comment that work in prison is merely a method to avoid boredom, that the brevity of time that Mr. Woodson knew his peers must have eliminated any element of peer pressure that he may have experienced, and that the defendant in *Miller* was resentenced to life in prison. The State counters that any due process claim was forfeited since this claim was not made in the circuit court.

¶ 106   While we agree with Mr. Woodson that some of the court's comments seem off point, we do not find anything rising to the level of a constitutional violation. Thus, we reject Mr. Woodson's constitutional claim.

¶ 107   However, we do find that some of the court's interjections offer additional support for the claim that the court failed to properly apply the *Miller* factors. Because we view Mr. Woodson's reference to these comments only as support for the excessive sentence claim that he made to the circuit court, we need not decide whether he forfeited his due process claim. See *Brunton v. Kruger*, 2015 IL 117663, ¶ 76 ("We require parties to preserve issues or claims for appeal; we do not require them to limit their arguments here to the same arguments that were made below.").

¶ 108   In deciding the import of the court's comments, *McKinley* is again instructive. There, the circuit court stated, " 'I think expert witnesses in murder cases should read the police reports so they understand what the facts are in the case' " (*McKinley*, 2020 IL App (1st) 191907, ¶ 51), the gun used in the crime " 'made [the defendant] older' " (*id.* ¶ 52), and the defendant " 'was entitled to more time in the penitentiary than even a 40-year sentence' " (*id.*). On review, we found that the "trial court's comments suggest[ed] a predisposition to punish certain types of offenders more

24

harshly." *Id.* ¶ 80. Similarly, in this case, the circuit court seemed predisposed to diminish the significance of Mr. Woodson's rehabilitation and his immaturity at the time of the offense. While we agree with the State that a circuit court judge is not required to passively observe proceedings, the tone of some of the court's questions and comments provides additional evidence of the circuit court's abuse of discretion and failure to reasonably apply the sentencing factors.

¶ 109 The court's comments further demonstrate an undue preoccupation with retribution. Relevant comments include the court's justification for its sentence—that Mr. Woodson may be a "nice guy" but the court saw him with a "gun in his hand," that when you "do bad things you have bad consequences," and "I don't dislike Antonio Woodson. I dislike what he did however." While, standing alone, none of the court's statements are inappropriate, when read together and considered in the context of the additional comments and general tone described above, the court demonstrated a departure from the spirit and purpose of section 5-4.5-105. As we cited, that purpose is to "rectify[ ] the core concerns implicated when sentencing juvenile offenders" as addressed by *Miller* and its progeny. *Cavazos*, 2023 IL App (2d) 220066, ¶ 42. *Miller*, in turn, held that "[t]he heart of the retribution rationale relates to an offender's blameworthiness, [and] the case for retribution is [simply] not as strong with a minor as with an adult." (Internal quotation marks omitted.) *Miller*, 567 U.S. at 472. Section 5-4.5-105 therefore makes clear that a circuit court is not free to apply a similar retributive rationale to a child as to an adult. The circuit court's comments seem to forget that Mr. Woodson was, while 17, ultimately a child at the time of the offense. These comments therefore add further support to our central holding that the circuit court failed to engage in a reasonable application of the *Miller* factors.

¶ 110 Mr. Woodson's third argument is that the court gave him improper admonitions on his right to elect whether to be sentenced under the "old law" in effect at the time of the crime or the "new

law" in effect when he was resentenced. In a hearing held prior to the resentencing hearing, the court seemed to suggest that, if Mr. Woodson chose to be sentenced under current law, the court could impose a 60-year sentence because his eligibility for parole eliminated any claim that he had been given a life sentence under *Buffer*. During the sentencing hearing, the court again suggested— this time to Mr. Woodson directly—that this election would impact what sentence he could be given.

¶ 111   On appeal, Mr. Woodson argues that there are several issues raised by the court's comments. The first is that Mr. Woodson's parole eligibility is decided by statute (730 ILCS 5/5-4.5-115(b) (West 2022)) and has nothing to do with the law he elects. The second is that it seems to imply that the judge would alter the sentence, including the impact of the *Miller* factors, based on Mr. Woodson's election.

¶ 112   However, as the State points out, "a trial court's mistaken explanation" does not in itself warrant vacating a defendant's sentence. Mr. Woodson's brief fails to explain how any error in what the court said impacted the sentence that Mr. Woodson received. Thus, we reject the argument that this is an additional basis on which we should vacate his sentence.

¶ 113                                    C. Sentence Reduction

¶ 114   Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) empowers this court to reduce excessive sentences. "Depending on the surrounding circumstances, we can choose to impose a new sentence or remand the matter for resentencing by the trial court." *McKinley*, 2020 IL App (1st) 191907, ¶ 91.

¶ 115   The evidence presented to the circuit court during Mr. Woodson's 2022 hearing was extensive. We see no need to further exhaust judicial resources by ordering a new hearing and recalling all of those witnesses. As we did in *McKinley*, we invoke our authority under Rule

615(b)(4) to reduce the sentence imposed.

¶ 116   In *McKinley*, we had before us statistical information about the average length of prison time juveniles received upon resentencing, pursuant to *Miller*, for convictions for murder. *Id.* ¶ 47. In that case, we reduced the defendant's sentence to 25 years followed by three years of mandatory supervised release. *Id.* ¶ 93. That seems like the right outcome in this case as well.

¶ 117   We accordingly reduce Mr. Woodson's 30-year sentence for murder by 5 years to 25 years and his 10-year sentence for vehicular hijacking also by 5 years, for an aggregate sentence of 30 years. As the circuit court noted, Mr. Woodson may earn good time credit for the vehicular hijacking sentence, and the total sentence would be followed by a term of mandatory supervised release.

¶ 118   The dissent points out that our supreme court has cautioned that Rule 615(b) is to be used sparingly. We agree. However, our supreme court has continued to utilize the power of 615(b)(4) where the circuit court has imposed a sentence that is an abuse of discretion because it is "greatly at variance with the spirit and purpose of the law." *Stacey*, 193 Ill. 2d at 210. In resentencing Mr. Woodson to a sentence of 40 years, the circuit court in this case imposed a sentence that was greatly at variance with the spirit, purpose, and mandate of the criminal code regarding juvenile sentences. In this unusual circumstance, we use the limited authority to reduce sentences granted to a reviewing court by this supreme court rule.

¶ 119   The dissent decries a "recent" trend on this court to ignore *People v. Streit*, 142 Ill. 2d 13 (1991) and reduce sentences that are not infected by specific legal error such as improper enhancement or an improper consecutive sentence. But recent cases, including this one, rest on the fact that the post-*Miller* juvenile sentencing statute now mandates that all sentences for juveniles give specific consideration to the defendant's lack of maturity at the time of the crime and, if such

evidence is available, rehabilitation subsequent to that time. See *McKinley,* 2020 Ill. App. (1st) 191907, ¶ 91.

¶ 120   The dissent also points out that it is not our job to substitute our judgment for that of the circuit court or to reweigh the sentencing factors. We agree again. But, as we recognized in *McKinley*, it is our job to ensure that the specific concerns that underlie the Supreme Court's decision in *Miller* and are codified in section 5-4.5-105 are reflected in the sentence. Key to the statute and the case law are the realities that defendants like Mr. Woodson have both "diminished culpability and heightened capacity for change." *Miller*, 567 U.S. at 479. Where, as in this case, those realities are confirmed by extensive evidence regarding the individual defendant's diminished capacity at the time of the crime and dramatic rehabilitation since that time, the failure to reflect those factors in the sentence is an abuse of discretion that we are not free to "rubber stamp" with approval. *McKinley*, 2020 IL App (1st) 191907, ¶ 86; *People v. Williams*, 2019 IL App (1st) 173131, ¶ 20.

¶ 121                                   IV. CONCLUSION

¶ 122   For the foregoing reasons, we reduce Mr. Woodson's sentence to 25 years for murder and 5 years for vehicular hijacking, with a mandatory supervised release term to follow, to the extent required by statute.

¶ 123   Sentence modified.

¶ 124   PRESIDING JUSTICE MITCHELL, dissenting:

¶ 125   It is commonly said that, among the most solemn duties entrusted to a trial judge, none is more sobering than sentencing a convicted criminal defendant. In that moment, the sentencing judge alone must fashion a sentence within the parameters set by statute that reflects the seriousness of the offense, vindicates the rule of law, and imposes a fair and just punishment. No

small task. Having heard the evidence at trial, the sentencing judge must weigh, among other factors, the harm to the victim and his family and the mitigating (and aggravating) factors surrounding the defendant's conduct. 730 ILCS 5/5-4-1(a) (West 2022). It is for this reason—the trial judge's superior position to weigh evidence and to make credibility determinations—that his sentencing determination is afforded great deference. *People v. Webster*, 2023 IL 128428, ¶ 29. A reviewing court should not do as the majority has done in this case: substitute its judgment for that of the trial judge and simply reweigh the sentencing factors.

¶ 126    Here, the defendant was subject on resentencing to a maximum aggregate sentence of 95 years' imprisonment: 20 to 60 years for first degree murder (730 ILCS 5/5-8-1(a)(1)(a) (West 2002)), a 20-year enhancement for personally discharging a firearm (*id.* § 5-8-1(a)(1)(d)(ii)), and 4 to 15 years for vehicular hijacking (720 ILCS 5/18-3(c) (West 2002)). In 2006, the trial judge originally sentenced the defendant to an aggregate term of 60 years, and on resentencing in 2022, the trial judge dropped the 20-year firearm enhancement. The trial judge sentenced the defendant to an aggregate term of 40 years: 30 years for the murder and 10 years for the vehicular hijacking. That sentence, within the statutory range, is presumed proper. *Webster*, 2023 IL 128428, ¶ 21. A 40-year aggregate sentence is less than half the potential maximum and represents a 33% reduction of the defendant's original sentence.

¶ 127    Despite this significant reduction in the defendant's sentence, the majority concludes that the trial judge did not consider all of the statutory mitigation factors required when sentencing an individual under age 18. 730 ILCS 5/5-4.5-105 (West 2022). (Remember our defendant was 17 years and 10 months old at the time he murdered his victim.) But the record does not support such a conclusion. A trial judge is presumed to have considered all the evidence placed before it. *People v. Garcia*, 2023 IL App (1st) 172005, ¶ 67; see *People v. Lopez*, 2019 IL App (3d) 170798, ¶ 23

29

(" 'Where relevant mitigating evidence is before the court, it is presumed that the court considered it absent some indication in the record to the contrary other than the sentence itself.' " (quoting *People v. Dominguez*, 255 Ill. App. 3d 995, 1004 (1994))). Further, the trial judge need not make an express finding on each factor that it considers, and an omission does not mean that the trial judge did not consider all the factors. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 31. Here, the trial judge stated more than once on the record that he had reviewed the defendant's submission in its entirety, and his colloquy with defense counsel demonstrates as much. The trial judge considered the defendant's arguments in mitigation; he just did not necessarily credit them. The law requires that the trial judge consider the mitigating factors; it does not require that the trial judge find each factor to be mitigating, let alone that the trial judge accept or credit each argument in mitigation. *Id.* Indeed, the General Assembly has mandated that the trial judge make an "independent assessment" of all the factors implicated at sentencing. 730 ILCS 5/5-4-1(b) (West 2022).

¶ 128 On the potential for rehabilitation (*id.* § 5-4.5-105(a)(4)), the trial judge expressly acknowledged the defendant's exemplary conduct in prison. The majority concedes this, as it must (*supra* ¶ 94), but finds that the trial judge did not attach enough weight to it. But, of course, it is not our job to reweigh the sentencing factors. *Alexander*, 239 Ill. 2d at 213. A defendant's potential for rehabilitation is not entitled to greater weight than the seriousness of the offense. *Id.* at 214. The defendant's mitigation expert noted in her report that defendant's success in prison is due at least in part to the structure of prison life, a structure that was absent from the defendant's life on the outside. The trial judge expressed appropriate skepticism as to some defense claims. For example, the defense elicited testimony from a prison guard that the defendant had access to sharp instruments as a prison barber and yet had never harmed anyone with them. This failure to foment

mayhem is hardly compelling proof of good character.

¶ 129   It is undisputed that the defendant murdered a man, and yet the defense case in mitigation curiously sought to minimize that fact at the cost of its own credibility. If the trial court had a "preoccupation" with the defendant's absence of remorse (*supra* ¶ 109) it is because an imprudent defense strategy invited it. The record is replete with examples. In her opening statement, defense counsel blamed the defendant's friend, Joshua Council, for the crime. In her closing argument, she repeatedly referred to the shooting as "an accident" in flagrant denial of the jury's verdict. A defense mitigation expert found in a hopelessly fawning report that the defendant was "the perfect scapegoat." Further, she opined that the defendant "felt great remorse instantly" and then, in the next sentence, described the defendant's flight from the jurisdiction after the murder as an effort to "start fresh." Suffice it to say, a trial judge does not abuse his discretion when he rejects claims that defy reality—even when those claims are made in mitigation.

¶ 130   Finally, a word on the majority's decision to invoke Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) to resentence the defendant to an aggregate term of 30 years. The rule provides that the reviewing court may "reduce the punishment imposed by the trial court" (*id.*), and research suggests that this case is the forty-ninth time the appellate court has done so since the rule's inception in 1967. The power has been used sparingly. In 1991, the Illinois Supreme Court reversed an appellate decision to modify a sentence on appeal where, like here, the reviewing court reweighed sentencing factors and substituted its judgment for that of the trial judge. See *People v. Streit*, 142 Ill. 2d 13, 20-21 (1991). After *Streit*, appellate decisions for more than a quarter of a century only reduced sentences where a legal error required it, such as an improper enhancement

31

or consecutive sentence.[1] That is, until this court's recent decisions where it has set about reweighing sentencing factors and substituting its judgment for that of the trial judge. See *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 91; *People v. Bruce*, 2022 IL App (1st) 210811, ¶ 42.

¶ 131 This trend is in clear tension with *Streit* and the well-established standards requiring deference to a trial judge's sentencing determination.[2]

¶ 132 For all these reasons, I respectfully dissent.

---

[1] See *People v. Manning*, 2017 IL App (1st) 152159-U, ¶ 34 (sentence classification); *People v. McDowell*, 2016 IL App (1st) 131081-U, ¶ 38 (sentence enhancement); *People v. Key*, 2014 IL App (1st) 120329-U, ¶¶ 26-27 (statutory maximum); *People v. Fernandez*, 2014 IL App (2d) 120892-U, ¶ 10 (extended term sentence); *People v. Brown*, 2013 IL App (1st) 102527-U, ¶ 31 (concurrent sentence); *People v. Guerrero*, 2011 IL App (2d) 090972, ¶ 99 (sentence reversed); *People v. Ramey*, 393 Ill. App. 3d 661, 671 (2009) (concurrent sentence); *People v. Reeves*, 385 Ill. App. 3d 716, 735 (2008) (same); *People v. Williams*, 385 Ill. App. 3d 359, 371 (2008) (same); *People v. Battle*, 378 Ill. App. 3d 817, 832-33 (2008) (same); *People v. Waldron*, 375 Ill. App. 3d 159, 161 (2007) (same); *People v. Smith*, 372 Ill. App. 3d 762, 772 (2007) (same); *People v. Spears*, 371 Ill. App. 3d 1000, 1008-09 (2007) (same); *People v. Dixon*, 366 Ill. App. 3d 848, 856 (2006) (same); *People v. Span*, 337 Ill. App. 3d 239, 241-42 (2003) (same); *People v. Townsell*, 336 Ill. App. 3d 340, 346 (2003) (statutory maximum); *People v. Townsell*, 328 Ill. App. 3d 616, 620 (2002) (same); *People v. Lee*, 326 Ill. App. 3d 882, 889 (2001) (*Apprendi*); *People v. Reiner*, 251 Ill. App. 3d 1065, 1067-68 (1993) (extended term sentence).

[2] *Stacey*, 193 Ill. 2d at 210, scarcely justifies the majority's decision to reweigh sentencing factors: while the Illinois Supreme Court reduced a trial court's sentence, it specifically noted that, "[i]n so holding, we are not reweighing any aggravating or mitigating factors."

*People v. Woodson*, **2024 IL App (1st) 221172**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 03-CR-22400; the Hon. Stanley J. Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Yasaman Hannah Navai, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, and Su Wang, Assistant State's Attorneys, of counsel), for the People. |